PRESENT:  All the Justices

DARIEN VASQUEZ

v.  Record No. 141071

COMMONWEALTH OF VIRGINIA

OPINION BY
JUSTICE D. ARTHUR KELSEY
February 12, 2016

BRANDON VALENTIN

v.  Record No. 150357

COMMONWEALTH OF VIRGINIA

FROM THE COURT OF APPEALS OF VIRGINIA

Darien Vasquez and Brandon Valentin, two sixteen-year-old males, broke into the

townhouse of a college student, raped her at knifepoint, and threatened to kill her if she resisted.

They also committed a host of other crimes before leaving the victim's townhouse.  The trial

court convicted Vasquez of eighteen felonies and Valentin of twelve felonies.

On appeal, Vasquez and Valentin claim that the aggregate term-of-years sentences

imposed by the court violated the Eighth Amendment's prohibition of cruel and unusual

punishment.  They also contend that the evidence was insufficient to establish that either one of

them possessed a knife at the time of the break-in.  On both contentions, we disagree and affirm.

I.

On appeal, we review the evidence in the "light most favorable" to the Commonwealth,

the prevailing party in the trial court.  Bowman v. Commonwealth, 290 Va. 492, 494, 777 S.E.2d

851, 853 (2015) (quoting Commonwealth v. Hudson, 265 Va. 505, 514, 578 S.E.2d 781, 786

(2003)).  "Viewing the record through this evidentiary prism requires us to 'discard the evidence

of the accused in conflict with that of the Commonwealth, and regard as true all the credible

evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" Id. (quoting Kelley v. Commonwealth, 289 Va. 463, 467-68, 771 S.E.2d 672, 674 (2015)).

A.

The victim, a female college student, lived in an off-campus townhouse with two housemates. One evening in October 2012, both of the victim's housemates were out of town, and she had gone to bed feeling sick. Vasquez and Valentin broke in through a window of the townhouse carrying backpacks, one of which contained a "wolf knife." J.A. at 403. They began stealing property belonging to the victim's housemates. They then entered the victim's bedroom. She awoke as Vasquez held a large knife to her throat. Valentin stood by the bedroom door, also holding a knife, and blocked the exit.

Vasquez demanded cash. When the victim said she had none, Vasquez stated, "[W]ell then you're going to die." Id. at 121. The victim pleaded with them to take her wallet, credit cards, and a game console. Pressing the knife to her back, Vasquez led the victim around the bedroom to retrieve these items. After collecting the victim's belongings, Vasquez ordered her to undress. He then pushed her to the floor and demanded that she "suck him off," or he would kill her. Id. at 123. She complied. As Vasquez forced her head down, she began choking.

After a few minutes, Vasquez put the knife again to her back and pushed her to the bed. With the knife "right in front of me," the victim testified, Vasquez raped her. Id. at 125. He later demanded she also have sex with Valentin. Vasquez directed her to "suck him off again" while Valentin attempted to penetrate her from behind. Id. at 127. While the victim performed fellatio on Vasquez for a second time, Valentin unsuccessfully attempted to penetrate her anus and vagina from behind. During this attempt, Valentin threatened the victim, saying, "[D]on't turn around, I'll kill you if you turn around." Id. at 128.

2

At some point, Vasquez got up and left the bedroom. Valentin closed the bedroom door and locked it, leaving the victim alone with him. While displaying his knife, Valentin pushed the victim back on the bed and raped her vaginally. Vasquez returned to the bedroom, led the victim to the bathroom at knifepoint, and made her perform fellatio on him a third time. He repeatedly struck her in the head with the blunt end of the knife and slapped her in the face. Vasquez then said he wanted anal sex. He ran his knife across her back and along her flank area. Vasquez attempted to rape her anally but could not successfully penetrate. Valentin watched from the doorway, continuing to block any attempt by the victim to escape.

Vasquez thereafter led the victim through other rooms of the townhouse looking for more things to steal. As Valentin took stolen property out through a window, Vasquez once again forced the victim to perform oral sex on him. He forcibly pushed his penis into her throat, choking her for several minutes. Vasquez afterwards turned her around and raped her anally with his penis and with another object.

Still armed with a knife, Vasquez then pulled the victim toward the window and told her that she would have to leave with them. Valentin pushed Vasquez away from the victim. Before leaving, Vasquez approached the victim with the knife, "jab[bed] it at [her] stomach," and warned her that they would "come back with thirty guys and kill [her]" if she called the police. Id. at 138.

Police arrested Vasquez and Valentin that same night.[1] They had in their possession the property stolen from the townhouse. They made various self-incriminating statements to the police and made similar inculpatory remarks to each other. Valentin admitted to breaking into the townhouse, stealing property, and raping the victim at knifepoint. "What fun is raping a

---

[1] After their initial arrest, Valentin escaped custody. He was not arrested again until two or three hours later when he was discovered "directly behind the victim's home." J.A. at 259.

bitch," he said, "and running?" Id. at 314. Reflecting on the episode, Valentin concluded:

"We're sixteen and we're getting tried as an adult [sic]. Should have killed that bitch." Id. at

318-19. Vasquez also confessed to the sexual crimes. Concluding that he would likely be found

guilty, Vasquez said he would simply "apologize for it." Id. at 319.

B.

The juvenile and domestic relations court transferred the prosecution of both defendants

to the circuit court, where the grand jury returned twenty-two felony indictments against

Vasquez and seventeen against Valentin. At their joint trial, Vasquez and Valentin made various

motions to strike. One of their arguments, relevant to the armed-with-a-deadly-weapon element

of the indictments for breaking and entering, was that the evidence was insufficient to prove that

either Vasquez or Valentin possessed a knife at the time they entered the townhouse. They

asserted "an alternate hypothesis of innocence that all the knives involved . . . were acquired . . .

once the two parties went into the apartment in general." Id. at 409. The trial court denied most

of the motions to strike[2] and found Vasquez guilty on eighteen indictments and Valentin guilty

on twelve.

The trial court ordered the preparation of presentence reports and victim-impact

statements. At the sentencing hearing, the trial court received extensive information addressing

the brutality of the crimes and their effect on the victim. The court also learned that Vasquez

was on juvenile probation at the time of the offenses and that, in the weeks prior to these crimes,

Valentin had committed multiple other nighttime break-ins of other occupied homes.

---

[2] The defendants argued that the single-larceny doctrine prohibited the multiple larceny indictments against them. The trial court specifically granted the defendants' motions to strike regarding duplicate larceny indictments (and the accompanying conspiracy indictments). See J.A. at 481, 486, 490, 493. The trial court also held that Valentin was not guilty of one indictment of attempted rape because the court found that it "was the same act" as another indictment. Id. at 492.

4

The trial court rejected the suggestion that the crimes were in any way unplanned or spontaneous. "These were each individual crimes," id. at 620, the court explained, committed at knifepoint by two "young predator[s]" in a "careful and calculated" manner over an extended period of time, id. at 619. The court stated that it considered Vasquez to be slightly more culpable than Valentin, but both were guilty of "absolutely heinous criminal acts." Id. at 628. The court also considered Valentin's lack of genuine remorse, evidenced by his post-arrest conversation showing Valentin "laughing" with Vasquez about their crimes and musing that it would have been better if they had just "killed the fucking bitch." Id. at 319, 629.[3]

At the conclusion of the hearing, the court imposed multiple term-of-years sentences, which, in the aggregate, equaled 283 years for Vasquez, with 150 years suspended, and 148 years for Valentin, with 80 years suspended. The suspended sentences reduced the active incarceration time to 133 years for Vasquez and 68 years for Valentin.[4] Between the two defendants and their total of thirty convictions, each conviction received an average of 6.7 years of active incarceration.

Vasquez and Valentin filed petitions for appeal with the Court of Appeals, challenging the constitutionality of their sentences and the sufficiency of the evidence supporting their convictions for breaking and entering while armed with a deadly weapon. In per curiam orders, the Court of Appeals denied Vasquez's petition in its entirety and denied Valentin's petition

[3] The trial court also took into account the fact that both defendants would be reviewed for possible conditional release under Code § 53.1-40.01, see J.A. at 621, 631, making available "the normal parole consideration process" to all convicts once they reach the age of sixty, Angel v. Commonwealth, 281 Va. 248, 275, 704 S.E.2d 386, 402 (2011).

[4] See Appellee's Br. Attach. 1, at 1-5 (Summary of Appellants' Indictments, Convictions, and Sentences). There appears to be a mathematical error in the appellee's final calculation of the total aggregate sentence for Valentin. See id. at 5. According to both the record and the contents of the appellee's summary, Valentin's total aggregate sentence is 148 years rather than 153, with a net sentence of 68 years rather than 73. See J.A. at 88-94 (Valentin's Sentencing Order).

regarding issues before this Court.[5] We awarded an appeal to both defendants, consolidated their cases for decision, and now affirm the Court of Appeals.

II.

A. CRUEL & UNUSUAL — AGGREGATE TERM-OF-YEARS SENTENCES

Vasquez and Valentin argue on appeal, as they did in the trial court, that their sentences should be judicially declared cruel and unusual under the Eighth Amendment to the United States Constitution. The United States Supreme Court has developed "two strands of precedent" to determine whether a criminal sentence is unconstitutionally disproportionate. Miller v. Alabama, 567 U.S. ___, ___, 132 S. Ct. 2455, 2463 (2012). The first is a "categorical" approach, fixing bright lines that limit criminal sentences "based on mismatches between the culpability of a class of offenders and the severity of a penalty." Id. The second is a "case-by-case approach," Graham v. Florida, 560 U.S. 48, 77 (2010), that focuses specifically on "all the circumstances in a particular case," id. at 59.[6]

In 2005, the Supreme Court commenced a trilogy of decisions adopting three categorical prohibitions for criminal offenders under the age of eighteen. First, no matter the severity of the crime, "[t]he Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed." Roper v. Simmons, 543 U.S. 551, 578 (2005). Second, the Eighth Amendment "prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide." Graham,

---

[5] The Court of Appeals granted Valentin's assignment of error regarding the sufficiency of the evidence for attempted anal intercourse by force, threat, or intimidation in violation of Code §§ 18.2-26 and -67.1. However, the Court of Appeals affirmed that conviction in an unpublished order, Valentin v. Commonwealth, Record No. 1791-13-3, 2015 Va. App. LEXIS 34 (Feb. 3, 2015), which is not challenged on appeal to this Court.

[6] This approach is best exemplified by Chief Justice Roberts's opinion concurring in the judgment in Graham, 560 U.S. at 86-96.

560 U.S. at 82. "A State need not guarantee the offender eventual release, but if it imposes a sentence of life it must provide him or her with some realistic opportunity to obtain release before the end of that term." Id. Finally, the Court held that "mandatory life-without-parole sentences for juveniles violate the Eighth Amendment." Miller, 567 U.S. at ___, 132 S. Ct. at 2464; see also Montgomery v. Louisiana, 577 U.S. ___, 2016 U.S. LEXIS 862, at *34-35 (Jan. 25, 2016) (holding that Miller applies retroactively to cases in which state courts collaterally review sentences imposed prior to Miller).

Vasquez and Valentin do not contend that their various term-of-years sentences violate the case-by-case approach to judging disproportionate sentences under the Eighth Amendment. They instead argue only that we should expand Graham's prohibition of life-without-parole sentences to non-life sentences that, when aggregated, exceed the normal life spans of juvenile offenders. For several reasons, we decline the invitation to do so.

First, we must clarify the precise holding of Graham. It clearly applied only to "the imposition of *a life without parole sentence* on a juvenile offender who did not commit homicide." Graham, 560 U.S. at 82 (emphasis added). The holding was so limited because, as the Court observed, "[t]he instant case concern[ed] *only* those juvenile offenders sentenced to *life without parole* solely for *a* nonhomicide offense." Id. at 63 (emphasis added). Nowhere did Graham address multiple term-of-years sentences imposed on multiple crimes that, by virtue of the accumulation, exceeded the criminal defendant's life expectancy.

Justice Alito made this very point in his dissent without the slightest suggestion to the contrary in the majority opinion. See id. at 124 (Alito, J., dissenting) ("Nothing in the Court's opinion affects the imposition of a sentence to a term of years without the possibility of parole."); see also United States v. Cobler, 748 F.3d 570, 580 n.4 (4th Cir. 2014) ("The Supreme

Court has not yet decided the question whether a lengthy term-of-years sentence is, for constitutional purposes, the same as a sentence of life imprisonment without the possibility of parole.").

As Vasquez's counsel acknowledges, Graham "did not address the question directly" that we face in this case. See Oral Argument Audio at 1:01 to 1:05. That should not deter us, he contends, because we have the "prerogative" to "extend" precedential holdings of the United States Supreme Court. Id. at 3:24 to 3:50. Valentin's counsel does not go that far. He merely contends that we should give precedential treatment to the "reasoning" in Graham, which generalized that "children are simply less culpable" than adults and have a "greater capacity for reform." Oral Argument Audio at 10:48 to 10:55. Neither of these views persuades us.

We are duty bound to enforce the Eighth Amendment consistent with the holdings of the highest court in the land. Cf. DIRECTV, Inc. v. Imburgia, 577 U.S. ___, ___, 136 S. Ct. 463, 468 (2015). But the duty to follow binding precedent is fixed upon case-specific holdings, not general expressions in an opinion that exceed the scope of a specific holding. Though perhaps a subtle distinction, Chief Justice John Marshall emphasized its importance to the judicial process:

> It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. *If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision.* The reason of this maxim is obvious. The question actually before the Court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated.

Cohens v. Virginia, 19 (6 Wheat.) U.S. 264, 399-400 (1821) (emphasis added) (quoted with approval in Virginia Ry. & Power Co. v. Dressler, 132 Va. 342, 350-51, 111 S.E. 243, 245-46

(1922)); see also Wright v. United States, 302 U.S. 583, 593-94 (1938) (reaffirming Chief Justice Marshall's "oft-repeated admonition").[7]

In other words, as Dean Lile explained, only a specific point "officially decided or settled" by a judicial holding "in a case in which it is directly and necessarily involved" can truly be called binding precedent. William M. Lile et al., Brief Making and the Use of Law Books 321 (Roger W. Cooley & Charles Lesley Ames eds., 3d ed. 1914). Understandably so, for the very concept of binding precedent presupposes that courts are "bound by holdings, not language." Alexander v. Sandoval, 532 U.S. 275, 282 (2001). Such distinctions are important if we want "to keep the scale of justice even and steady" and to keep it from tipping in one direction or the other "with every new judge's opinion" or "private sentiments" on the subject. 1 William Blackstone, Commentaries *69.

That is exactly the situation we face here. Neither Vasquez nor Valentin was convicted of a single crime accompanied by a life-without-parole sentence. Vasquez was found guilty of eighteen separate crimes, including forcible vaginal and anal rape, breaking and entering while armed with a deadly weapon, forcible fellatio, forcible sodomy, abduction, and robbery. Valentin was found guilty of twelve similar crimes. Between the two of them, the average per-crime sentence was 6.7 years of active incarceration. The only reason that the aggregate sentences exceeded their life expectancies was because they committed so many separate crimes. These cases are nothing like Graham, which involved a single crime resulting in a single life-without-parole sentence.

---

[7] See also Cardwell v. Norfolk & W. Ry. Co., 114 Va. 500, 510, 77 S.E. 612, 616 (1913) ("The language used in the opinion in that case, as in all cases, must be read and interpreted in the light of the facts of the case in judgment."); Martin P. Burks, Common Law and Statutory Pleading and Practice § 431, at 851 (T. Munford Boyd ed., 4th ed. 1952) ("General expressions in an opinion . . . may be respected but do not control the judgment in a subsequent suit.").

Our refusal to extend <u>Graham</u> beyond its holding to a dissimilar context finds support from two of the three United States Courts of Appeal that have addressed this issue. The Sixth Circuit has held that <u>Graham</u> "does not clearly establish that consecutive, fixed-term sentences for juveniles who have committed multiple nonhomicide offenses are unconstitutional when they amount to the practical equivalent of life without parole." <u>Bunch v. Smith</u>, 685 F.3d 546, 547 (6th Cir. 2012). The "analysis" in <u>Graham</u>, the Sixth Circuit reasoned, simply "did not encompass consecutive, fixed-term sentences." <u>Id.</u> at 551.[8] The Fifth Circuit has come to the same conclusion, holding that neither <u>Graham</u> nor <u>Miller</u> "applies to [a] discretionary federal sentence for a term of years" and that to attempt such an application "would require the extension of precedent." <u>United States v. Walton</u>, 537 F. App'x 430, 437 (5th Cir. 2013) (per curiam).[9]

---

[8] <u>See also</u> <u>Goins v. Smith</u>, 556 F. App'x 434, 439-40 (6th Cir. 2014) (following <u>Bunch</u> and refusing to apply <u>Graham</u> to a juvenile nonhomicide offender facing a sentence of 84 years); <u>United States v. Walker</u>, 506 F. App'x 482, 489 (6th Cir. 2012) (noting that "<u>Graham</u> does not apply in cases where the defendant receives a sentence that is 'less severe' than a life sentence").

[9] <u>See also</u> <u>State v. Kasic</u>, 265 P.3d 410, 415 (Ariz. Ct. App. 2011) (holding <u>Graham</u> inapplicable to an aggregate sentence for "thirty-two felonies involving multiple victims" where "the longest prison term . . . for any single count was 15.75 years"); <u>State v. Brown</u>, 118 So. 3d 332, 335, 341 (La. 2013) (holding <u>Graham</u> inapplicable to a 70-year aggregate sentence where defendant would not be eligible for release until age 86); <u>Willbanks v. Missouri Dep't of Corrs.</u>, No. WD77913, 2015 Mo. App. LEXIS 1100, at *50 (Mo. Ct. App. Oct. 27, 2015) (unpublished) ("declin[ing] to extend <u>Graham's</u> holding to multiple, consecutively imposed, non-[life without parole], term-of-years sentences"); <u>State v. Watkins</u>, Nos. 13AP-133, -134, 2013 Ohio App. LEXIS 5791, at *13-14 (Ohio Ct. App. Dec. 17, 2013) (unpublished) (holding <u>Graham</u> inapplicable to a 67-year aggregate sentence for a juvenile nonhomicide offender), <u>appeal granted by</u> 10 N.E.3d 737 (Ohio 2014); <u>State v. Merritt</u>, No. M2012-00829-CCA-R3-CD, 2013 Tenn. Crim. App. LEXIS 1082, at *16 (Tenn. Crim. App. Dec. 10, 2013) (unpublished) (holding <u>Graham</u> inapplicable to a 225-year aggregate sentence comprised of nine 25-year consecutive sentences); <u>Burnell v. State</u>, No. 01–10–00214-CR, 2012 Tex. App. LEXIS 34, at *23-24 (Tex. Ct. App. Jan. 5, 2012) (unpublished) (holding <u>Graham</u> inapplicable to a 25-year sentence). <u>But see</u> <u>People v. Caballero</u>, 282 P.3d 291, 295 (Cal. 2012), <u>rev'g</u> 119 Cal. Rptr. 3d 920 (Cal. Ct. App. 2011); <u>Henry v. State</u>, 175 So. 3d 675, 680 (Fla. 2015), <u>rev'g</u> 82 So. 3d 1084 (Fla. Dist. Ct. App. 2012).

The only federal appellate court to reach the opposite conclusion is the Ninth Circuit. In Moore v. Biter, 725 F.3d 1184, 1188 (9th Cir. 2013), a panel of the Ninth Circuit acknowledged that "Graham broke new ground" in applying the Eighth Amendment to a single criminal conviction resulting in a single life-without-parole sentence. Undeterred by that fact, the panel proceeded to extend Graham to a case involving a juvenile defendant who was convicted of twenty-four felonies (none individually resulting in a life sentence) involving sexual attacks on four women over a five-week period.

These crimes, committed while the defendant was armed with a firearm, included "nine counts of forcible rape, seven counts of forcible oral copulation, two counts of attempted second degree robbery, two counts of second degree robbery, forcible sodomy, kidnaping with the specific intent to commit a felony sex offense, genital penetration by a foreign object," as well as "the unlawful driving or taking of a vehicle." Moore, 725 F.3d at 1186. This context, the Ninth Circuit panel contended, was "indistinguishable" from Graham. Id.[10]

The full Ninth Circuit rejected en banc review of the Moore panel decision, provoking a written dissent by seven judges. Judge O'Scannlain summarized their disagreement with the panel decision as follows:

> Our Court defies [federal habeas law] once again, this time by failing to distinguish one 'life without parole' sentence from multiple 'term-of-years' sentences. A panel of this Court holds that Graham . . . invalidates the latter, ignoring the contrary holding of the Sixth Circuit, disregarding the views of state courts across the country, and flouting Graham's text and reasoning.

---

[10] In doing so, the Ninth Circuit panel reversed the opposite holding of the district court, Moore v. Biter, No. CV 11-4256, 2011 U.S. Dist. LEXIS 71438 (C.D. Cal. July 1, 2011), as well as rulings of the California Superior Court, California Court of Appeal, and California Supreme Court, which had each rejected related state habeas petitions. See Moore, 725 F.3d at 1187.

11

Moore v. Biter, 742 F.3d 917, 917-18 (9th Cir. 2014) (O'Scannlain, J., dissenting) (footnote

omitted), denying reh'g en banc to 725 F.3d 1184 (9th Cir. 2013).  The panel decision, Judge

O'Scannlain noted, failed to

> confront the most meaningful distinction between Moore's case
> and Graham:  Moore's term of imprisonment is composed of over
> two dozen separate sentences, none longer than eight years;
> Graham's is one sentence, "life without parole."  Because the
> Supreme Court explicitly stated that Graham concerned "only
> those juvenile offenders sentenced to life without parole solely for
> a nonhomicide offense," 560 U.S. at 62, it "did not clearly
> establish that consecutive, fixed-term sentences for juveniles who
> commit multiple nonhomicide offenses are unconstitutional when
> they amount to the practical equivalent of life without parole,"
> Bunch, 685 F.3d at 550.

Id. at 919.  The dissent also contested the suggestion that the *rationale* of Graham, if not its

holding, applied to situations other than a life-without-parole sentence.  "Graham's reasoning,"

Judge O'Scannlain observed, "makes clear that the Supreme Court did not squarely address

aggregate term-of-years sentences."  Id.

Finally, Judge O'Scannlain raised a number of questions — wholly unexamined in

Graham — that would need to be answered if the holding of Graham were extended to aggregate

term-of-years sentences:

> "At what number of years would the Eighth Amendment become
> implicated in the sentencing of a juvenile:  twenty, thirty, forty,
> fifty, some lesser or greater number?  . . . Could the number [of
> years] vary from offender to offender based on race, gender,
> socioeconomic class or other criteria?  Does the number of crimes
> matter?" . . .  Also, "What if the aggregate sentences are from
> different cases?  From different circuits?  From different
> jurisdictions?  If from different jurisdictions, which jurisdiction
> must modify its sentence or sentences to avoid constitutional
> infirmity?"

12

Id. at 922 (citations omitted).  We asked similar questions to Vasquez's counsel during oral argument in this case.  With commendable candor, counsel conceded that no clear answers could be reliably given.  See Oral Argument Audio 11:06 to 11:15; id. 12:32 to 12:40.

With nothing more to rely on than Graham, we believe that attempting to answer these questions (particularly with the level of specificity necessary for a principled application of Eighth Amendment law) would require a proactive exercise inconsistent with our commitment to traditional principles of judicial restraint.  We thus agree with the Sixth Circuit, the Fifth Circuit, and the seven dissenters of the Ninth Circuit:  Graham does not apply to aggregate term-of-years sentences involving multiple crimes, and we should not declare that it does.  For this reason, we reject the argument of Vasquez and Valentin that their sentences violate the Cruel and Unusual Punishment Clause of the Eighth Amendment.

Our holding, however, should not be read to signal the end of debate on the underlying issues raised by aggregate term-of-years sentences imposed upon juveniles.  In life-without-parole cases governed by Graham, "[i]t is for the State, in the first instance, to explore the means and mechanisms for compliance."  Graham, 560 U.S. at 75.  Equally so, in cases like those now before us where Graham does not apply, the Commonwealth — through the lawmaking power of the General Assembly — has the opportunity to explore additional ways of calibrating the just aims of the criminal justice system to the unique circumstances of juvenile offenders, particularly in cases in which juveniles commit nonviolent crimes and demonstrate a level of genuine contrition suggesting a realistic hope of rehabilitation.

Our holding implies no views and takes no sides in the policy debates that may take place during the legislative process.  As we have often said, the legislature is the "author of public policy."  In re Woodley, 290 Va. 482, 490, 777 S.E.2d 560, 565 (2015) (citation omitted).  Our

13

role is limited to answering the narrow question raised by these cases: whether the aggregate term-of-years sentences imposed on Vasquez and Valentin violate the Eighth Amendment. Because they do not, our judicial task is over and the democratic process continues.

## B. SUFFICIENCY OF THE EVIDENCE — POSSESSION OF A DEADLY WEAPON

The trial court convicted Vasquez and Valentin of breaking and entering with intent to commit larceny while "armed with a deadly weapon at the time of entry," in violation of Code § 18.2-91.[11] On appeal, neither defendant denies that a knife in this factual context constitutes a deadly weapon. Instead, they argue only that the evidence was insufficient to prove beyond a reasonable doubt that either one of them possessed a knife at the time of their entry into the victim's townhouse.

1.

As noted earlier, we review the evidence at trial in the light most favorable to the prevailing party. Here, that principle requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." Bowman, 290 Va. at 494, 777 S.E.2d at 853 (citation omitted). Additionally, our appellate review "is not limited to the evidence mentioned by a party in trial argument or by the trial court in its ruling." Id. at 494 n.1, 777 S.E.2d at 853 n.1 (quoting Perry v. Commonwealth, 280 Va. 572, 580, 701 S.E.2d 431, 436 (2010)). "Instead, 'an appellate court must consider all the evidence admitted at trial that is contained in the record,'" not limiting itself to "merely the evidence that the reviewing court considers most trustworthy." Id. (quoting Commonwealth v. Jenkins, 255 Va. 516, 522, 499 S.E.2d 263, 266 (1998)).

---

[11] The "armed with a deadly weapon" element of the crime, Code § 18.2-91, makes it a Class 2 felony, id. § 18.2-10(b).

14

At trial, an investigating officer testified that each defendant admitted to carrying a backpack into the townhouse. During questioning, Valentin initially denied having a knife but then conceded having a "hunting knife" in one of the bags. J.A. at 305. Valentin admitted possessing the knife at the time of entry but claimed that it was not the one later used during the crimes. One of the black bags found in Valentin's possession after his arrest had two knives in it, and one was "a knife with a wolf head on it." Id. at 403. No evidence suggested that the "wolf knife" was owned by the victim or her housemates. See id. at 403-04. The officer also testified that both defendants admitted during questioning to being in "possession" of both backpacks. Id.

Another investigating officer testified about his interview with Vasquez. During that interview, Vasquez admitted to carrying "a little knife when he entered the residence." Id. at 353. He kept the knife in his jacket, Vasquez stated. Later in this testimony, the officer added that Vasquez also stated that he "found" the knife "when [he] went in" the victim's townhouse. Id. at 370. It was not clear, the officer noted, whether Vasquez meant "right outside or inside," but it was clear that Vasquez was saying the knife was found "as they were entering" the townhouse. Id. at 401.

Claiming that this evidence was internally inconsistent, the defendants contend that the Commonwealth did not exclude "an alternative hypothesis of innocence" that both defendants armed themselves with knives only after entering the townhouse. Vasquez's Opening Br. at 19. For several reasons, we disagree.

2.

Under the governing standard of review, "we review factfinding with the highest degree of appellate deference." Bowman, 290 Va. at 496, 777 S.E.2d at 854. In a criminal case

15

appealed on sufficiency grounds, "[a]n appellate court does not 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" Williams v. Commonwealth, 278 Va. 190, 193, 677 S.E.2d 280, 282 (2009) (quoting Jackson v. Virginia, 443 U.S. 307, 318-19 (1979)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Id. (citation omitted).[12] This deferential appellate standard "applies not only to findings of fact, but also to any reasonable and justified inferences the fact-finder may have drawn from the facts proved." Sullivan v. Commonwealth, 280 Va. 672, 676, 701 S.E.2d 61, 63-64 (2010). These principles apply "with equal force" to bench trials no differently than to jury trials. See Cobb v. Commonwealth, 152 Va. 941, 953, 146 S.E. 270, 274 (1929).

A rational factfinder could easily conclude from the evidence in this case, as the trial court did, that Vasquez and Valentin acted in concert during the break-in of the victim's townhouse. See, e.g., J.A. at 478-79. Valentin's admitted possession of the "wolf knife" at that time, in one of the two backpacks used by the defendants, constitutes ample evidence of joint possession of a knife at the time of entry. See Thomas v. Commonwealth, 279 Va. 131, 159, 688 S.E.2d 220, 236 (2010) (noting that "the law is well settled in Virginia that each co-actor is responsible for the acts of the others" (quoting Carter v. Commonwealth, 232 Va. 122, 126, 348 S.E.2d 265, 267-68 (1986)). Equally relevant is Vasquez's statement that he also had a "little knife" in his jacket at the time of the break-in. J.A. at 353. Together, this evidence

---

[12] See also 7 Wayne R. LaFave et al., Criminal Procedure § 27.5(e), at 123 (4th ed. 2015) ("Appeals of guilty verdicts by juries and guilty findings by judges based on insufficiency of evidence are evaluated by asking, 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements beyond a reasonable doubt.'" (quoting Jackson, 443 U.S. at 319)); accord 6 id. § 24.6(b), at 572; id. § 24.6(c), at 578-79.

supports the trial court's finding of fact that at least one of the defendants possessed a deadly weapon at the time of their entry into the victim's townhouse.

3.

Despite this evidence, Vasquez and Valentin nonetheless contend that a reasonable hypothesis of innocence still exists. It is plausible, they insist, that they did not possess any knives until after the entry, suggesting that they took knives from one of the housemate's bedrooms in the townhouse. We find this argument conceptually redundant.

Properly understood, the reasonable-hypothesis principle is not a discrete rule unto itself. "The statement that circumstantial evidence must exclude every reasonable theory of innocence is simply another way of stating that the Commonwealth has the burden of proof beyond a reasonable doubt." Hudson, 265 Va. at 513, 578 S.E.2d at 785. Thus, the principle "does not add to the burden of proof placed upon the Commonwealth in a criminal case." Id. It merely echoes "the standard applicable to every criminal case." Cook v. Commonwealth, 226 Va. 427, 433, 309 S.E.2d 325, 329 (1983); see also Pease v. Commonwealth, 39 Va. App. 342, 360, 573 S.E.2d 272, 280 (2002) (en banc), aff'd, 266 Va. 397, 588 S.E.2d 149 (2003) (per curiam) (adopting the opinion of the Court of Appeals).

It is true that a factfinder cannot "arbitrarily" choose, as between two equally plausible interpretations of a fact, one that incriminates the defendant. Dixon v. Commonwealth, 162 Va. 798, 803, 173 S.E. 521, 523 (1934) (citation omitted). The choice becomes arbitrary, however, only when no rational factfinder could believe the incriminating interpretation of the evidence and disbelieve the exculpatory one. See Williams v. Commonwealth, 193 Va. 764, 772, 71 S.E.2d 73, 77 (1952) (observing that the Dixon principle does not apply if the exculpatory

17

explanation is "untenable under all the facts and circumstances of the case").[13]  When examining

an alternate hypothesis of innocence, the question is not whether "some evidence" supports the

hypothesis, but whether a rational factfinder could have found that the incriminating evidence

renders the hypothesis of innocence unreasonable.  Hudson, 265 Va. at 513, 578 S.E.2d at 785.

In this case, it was far from arbitrary for the trial court, sitting as factfinder, to believe the

incriminating statements made by Vasquez and Valentin about their possession of the "wolf

knife" and the "little knife" at the time of the break-in.  We acknowledge that the investigator's

testimony appeared to describe differing statements by Vasquez as to the exact timing of the

possession of the "little knife."  A factfinder, however, could rationally believe the incriminating

statement by Vasquez and disbelieve his later, self-serving clarification.  When considering the

statements of a suspect, a factfinder "may believe them in whole or in part, as reason may

decide."  Durham v. Commonwealth, 214 Va. 166, 169, 198 S.E.2d 603, 606 (1973).[14]

III.

In sum, we find no basis for declaring the aggregate sentences imposed on Vasquez and

Valentin to be cruel and unusual under the Eighth Amendment.  Nothing in Graham dictates that

---

[13] Stated another way, "[m]erely because [the] defendant's theory of the case differs from that taken by the Commonwealth does not mean that every reasonable hypothesis consistent with his innocence has not been excluded."  Miles v. Commonwealth, 205 Va. 462, 467, 138 S.E.2d 22, 27 (1964).  In practical terms, this means that — even if "not inherently incredible" — a defendant's exculpatory version of events need not be accepted by the factfinder.  Montgomery v. Commonwealth, 221 Va. 188, 190, 269 S.E.2d 352, 353 (1980) (emphasis omitted).

[14] We acknowledge Vasquez's argument that it was the investigator, not Vasquez, who gave inconsistent statements.  In the light most favorable to the Commonwealth, however, the trial court could instead conclude that Vasquez gave differing statements to the investigator at different times during the interview.  But even if the investigator's testimony were internally inconsistent, that fact would not, by itself, necessarily preclude the trial court from finding the investigator's first recollection more reliable than his later one.  See Barrett v. Commonwealth, 231 Va. 102, 107, 341 S.E.2d 190, 193 (1986) (stating that factfinders are "not required to accept, *in toto*, either the theory of the Commonwealth or that of an accused.  They have the right to reject that part of the evidence believed by them to be untrue and to accept that found by them to be true." (citation omitted)).

multiple sentences involving multiple crimes be treated, for Eighth Amendment purposes, in exactly the same manner as a single life-without-parole sentence for a single crime.

We also find the evidence sufficient to prove beyond a reasonable doubt that either or both Vasquez and Valentin possessed a deadly weapon when they entered the victim's townhouse on the night of the crimes. The Court of Appeals, therefore, did not err in denying their petitions for appeal on this ground.

<u>Affirmed.</u>

JUSTICE MIMS, with whom JUSTICE GOODWYN joins, concurring.

I concur with the majority's conclusion that the sentences imposed on Vasquez and Valentin do not violate the Eighth Amendment's prohibition on cruel and unusual punishment. The sentencing record demonstrates that these crimes were the culmination of a series of planned burglaries and escalating violations of the law. Indeed, the incident was itself a series of depraved personal attacks, during the course of which there were multiple opportunities to withdraw. Further, Vasquez, in particular, has failed to take advantage of the opportunities previously afforded him by the juvenile justice system. For these reasons, the sentences are wholly appropriate for crimes as wantonly evil as those recited in the majority opinion.

I write separately because I respectfully disagree with the Court's conclusion that <u>Graham v. Florida</u>, 560 U.S. 48 (2010), does not apply when determining the constitutionality of those sentences. I believe that <u>Graham</u>'s prohibition on sentences of life without parole for juveniles who commit non-homicide offenses does apply to a term-of-years sentence that

constitutes a de facto life sentence imposed in a single sentencing event.[1] Nonetheless, our precedent precludes reversing the Court of Appeals even after applying Graham. In Angel v. Commonwealth, 281 Va. 248, 704 S.E.2d 386 (2011), this Court held that Virginia's geriatric release statute provides the requisite meaningful opportunity for release based on demonstrated maturity and rehabilitation that Graham requires. Vasquez and Valentin will be eligible for such release.

Citing as authority a per curiam opinion from a panel of the Fifth Circuit, a decision by a panel of the Sixth Circuit, and an opinion endorsed by a minority of judges on the Ninth Circuit (as well as lower state court rulings, most unpublished), the majority asserts that Graham is limited to instances when a juvenile defendant is sentenced to the specific sentence of "life without parole," and does not apply when a juvenile defendant is sentenced to a term of years that is a de facto life sentence, such as the 133 years without parole to which Vasquez was sentenced. Along with the Ninth Circuit, and five state courts of last resort that have examined the applicability of Graham to a term of years equivalent to a de facto life sentence without the possibility of parole, I disagree.

In Graham, the United States Supreme Court stated, "The present case involves an issue the Court has not considered previously: a categorical challenge to a term-of-years sentence." Graham, 560 U.S. at 61 (emphasis added). It is true that the Court considered only the sentence before it – a sentence of life without the possibility of parole for a single non-homicide crime. However, the Court's rationale applies equally to a de facto life sentence because "there are no

---

[1] A de facto life sentence is only one in which there is no question that the individual will not be released during his lifetime, not merely one in excess of an actuarial estimate of an individual's lifespan. As parole has been abolished in Virginia, any sentence that is clearly in excess of a juvenile's life expectancy will result in that juvenile having to serve the remainder of his or her life in prison without the possibility of parole.

20

constitutionally significant distinguishable facts between" the two.  Moore v. Biter, 725 F.3d

1184, 1191-93 (9th Cir. 2013).  The Supreme Courts of Florida, Indiana, Wyoming, California

and Iowa agree.[2]

In four recent cases, the Supreme Court has elaborated on what types of punishment are

proportional, and therefore constitutional, for juvenile offenders.  In Roper v. Simmons, 543 U.S.

551, 560 (2005) (internal quotation marks and citation omitted), the Court affirmed "the basic

precept of justice that punishment of a crime should be graduated and proportional to the

offense."  It then prohibited imposition of the death penalty for juveniles for three reasons: first,

juveniles have a "lack of maturity and an underdeveloped sense of responsibility" that "often

result[s] in impetuous and ill-considered actions and decisions;" second, "juveniles are more

vulnerable or susceptible to negative influences and outside pressures, including peer pressure"

and often unable to extricate themselves from criminogenic settings; and third, "the character of

juveniles is not as well formed as that of an adult.  The personality traits of juveniles are more

transitory, less fixed."  Id. at 569-70 (internal quotation marks and citations omitted).  Thus,

Roper concluded that the harshest penalty – death – violates the proportionality principle

---

[2] Henry v. State, 175 So. 3d 675, 679-80 (Fla. 2015) (holding that "that the constitutional prohibition against cruel and unusual punishment under Graham is implicated when a juvenile non-homicide offender's sentence does not afford any meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation") (internal quotation marks and citation omitted); Brown v. State, 10 N.E.3d 1, 8 (Ind. 2014) (observing that "[s]imilar to a life without parole sentence, Brown's 150 year sentence 'forswears altogether the rehabilitative ideal,'" and violates Graham) (quoting Graham, 560 U.S. at 74); Bear Cloud v. State, 334 P.3d 132, 141-42 (Wyo. 2014) (finding aggregate sentences that result in the functional equivalent of life without parole are subject to Miller and Graham); People v. Caballero, 282 P.3d 291, 294-95 (Cal. 2012) (concluding that "sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment" because it implicates the same concerns expressed in Graham); see also State v. Null, 836 N.W.2d 41, 71 (Iowa 2013) (holding that "while a minimum of 52.5 years imprisonment is not technically a life-without-parole sentence, such a lengthy sentence imposed on a juvenile is sufficient to trigger Miller-type protections").

21

intrinsic in the Eighth Amendment's prohibition on cruel and unusual punishment as applied to any juvenile offender.  Id. at 573-74.

Six years later, in Graham, the Court relied upon Roper's rationale that "because juveniles have lessened culpability they are less deserving of the most severe punishments" to declare that the Eighth Amendment of the Constitution

> prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide. A State need not guarantee the offender eventual release, but if it imposes a sentence of life it must provide him or her with some realistic opportunity to obtain release before the end of that term.

Graham, 560 U.S. at 68, 82.

The Court in Graham explained that a sentence of life in prison without parole for a juvenile non-homicide offender also violates the proportionality principle because it is the second harshest penalty the law can impose, but such offenders are less culpable by virtue of their age-related characteristics, and also have a greater potential for rehabilitation.  Id. at 69-71. The Court noted that life in prison without the possibility of parole for juvenile non-homicide offenders fails to further any legitimate penological goal – retribution, deterrence, incapacitation or rehabilitation – and is, therefore, disproportionate and unconstitutional.  Id. at 71-73.  Graham recognized that "[t]he Eighth Amendment does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life." Id. at 75.  However, "[i]t does prohibit States from making the judgment at the outset that those offenders never will be fit to reenter society."  Id.  Accordingly, states must "give defendants like Graham" – a juvenile non-homicide offender whose "sentence guarantees he will die in prison" – "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation."  Id. at 75, 79.

22

Then, in <u>Miller v. Alabama</u>, 576 U.S. ___, 132 S. Ct. 2455 (2012), the Court reiterated the constitutional differences between juvenile and adult offenders it had identified in <u>Roper</u> and <u>Graham</u>. 132 S. Ct. at 2464-66. It held that

> the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders. . . . By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment.

<u>Id.</u> at 2469. The Court emphasized that "[m]ost fundamentally, <u>Graham</u> insists that youth matters in determining the appropriateness of a lifetime of incarceration without the possibility of parole." <u>Id.</u> at 2465. It further observed that "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon" due to the difficulty of distinguishing "between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." <u>Id.</u>

Finally, in <u>Montgomery v. Louisiana</u>, the Court considered "whether <u>Miller</u> adopts a new substantive rule that applies retroactively on collateral review to <u>people condemned as juveniles to die in prison</u>." 577 U.S. ___ (slip op. at 4-5) (2015) (emphasis added). Though Montgomery himself challenged an explicit life sentence, neither the parties nor the Court saw that label as the relevant constitutional factor – rather, it was the fact that Montgomery, at the age of 17, was subject to a punishment that ensured he would spend the rest of his life behind bars. Throughout, the Court characterized a disproportionate sentence as one that "condemn[s] [the juvenile] to die in prison," results in "a lifetime in prison," or one in which the prisoner "spen[ds] each day . . . knowing he [is] condemned to die in prison" and deprived of "hope for some years of life outside prison walls." <u>Id.</u> at ___ (slip op. at 3, 17, 21, 22). Each of these characterizations applies with equal force to a de facto life sentence. Additionally, the Court observed that "<u>Miller</u> . . . established that the penological justifications for life without parole collapse in light of the

23

distinctive attributes of youth." Id. at ___ (slip op. at 16) (quotation marks and citation omitted). The Court concluded that Miller applies retroactively because it announced a substantive constitutional right:

> Miller, then, did more than require a sentencer to consider a juvenile offender's youth before imposing life without parole . . . . Even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects "'unfortunate yet transient immaturity.'"

Id. at ___ (slip op. at 16-17) (quoting Roper, 543 U.S. at 573; Graham, 560 U.S. at 68). In other words, Miller "rendered life without parole an unconstitutional penalty for 'a class of defendants because of their status' – that is, juvenile offenders whose crimes reflect the transient immaturity of youth." Id. at ___ (slip op. at 17) (citation omitted). As with Graham and Miller, this rationale applies with equal force to de facto life sentences.

When imposing either an explicit or de facto life sentence, a court is condemning the juvenile to life in prison. In both scenarios, according to the United States Supreme Court, the lack of penological justifications renders the punishment disproportionate. In light of the concerns expressed in Roper, Graham concluded that the Eighth Amendment "prohibit[s] States from making the judgment at the outset that [juvenile non-homicide] offenders never will be fit to reenter society." Graham, 560 U.S at 75. However, when a court sentences a juvenile to a term-of-years sentence in excess of his life expectancy, it does just that.

The Court's holdings in Miller and Montgomery support the conclusion that any distinction between explicit and de facto life sentences without parole is one without a difference. The Miller Court explained that "[m]ost fundamentally, Graham insists that youth matters in determining the appropriateness of a lifetime of incarceration without the possibility of parole." Miller, 132 S. Ct. at 2465. It did not limit Graham's application to the

24

appropriateness of life sentences without parole, but instead spoke to any sentence which results in a juvenile spending his entire life in prison. We cannot ignore the reality that a seventeen year-old sentenced to life without parole (Graham) and a sixteen year-old sentenced to a term of years beyond his lifetime (Vasquez) have effectively received the same sentence. Because both sentences deny the juvenile the chance to return to society, Graham applies to both sentences.

Graham required only that the state provide some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation; it did not indicate when such an opportunity must be provided or give guidance regarding its nature or structure. Rather, it left it to the states to determine the "means and mechanisms for compliance." Graham, 560 U.S. at 75. In Montgomery, the Court discussed the distinction between "a procedural requirement necessary to implement a substantive guarantee [and] a rule that regulates only the manner of determining the defendant's culpability." 577 U.S. ___ (slip op. at 18). The Court explained that "when a new substantive rule of constitutional law is established, this Court is careful to limit the scope of any attendant procedural requirement to avoid intruding more than necessary upon the States' sovereign administration of their criminal justice systems." Montgomery 577 U.S. ___ (slip op. at 19); see also Ford v. Wainwright, 477 U.S. 399, 416-17 (1986) (explaining that the Supreme Court "leave[s] to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences."). Here, the "substantive nature of the federal right at issue," Montgomery, 577 U.S. ___ (slip op. at 20), is for a juvenile sentenced to a lifetime in prison for a nonhomicide crime to have "a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." Graham, 560 U.S. at 75.

In Angel, 281 Va. at 275, 704 S.E.2d at 402, we held that geriatric release pursuant to Code § 53.1-40.01 is an appropriate statutory mechanism to provide that opportunity.[3] The statute provides an age-based review according to normal parole considerations including the individual's personal, social and criminal history, his conduct in prison including engagement in rehabilitative and vocational programs, the sentence and type of offense, changes in motivation, and results of psychological testing. Virginia Parole Board, Policy Manual 2-4 (2006). These considerations certainly allow the Board to consider age, maturity and rehabilitation as Graham instructs.

I note, though, that whether the geriatric release statute as applied will continue to provide the "meaningful opportunity for release" required by Graham is subject to debate. Statistics describing the frequency with which geriatric release has been granted post-Angel are troubling: less than 4% of the eligible offenders who applied for geriatric release have received early release. See Virginia Dep't of Corr., FY2014 Geriatric Offenders Within the SR Population 7 (Sept. 2015), https://vadoc.virginia.gov/about/facts/research/ Geriatric2015.pdf (last visited Feb. 5, 2016) (7 of the 207 applicants received geriatric release); Virginia Dep't of Corr., Geriatric Offenders Within the SR Population 7 (July 2014), https://vadoc.virginia.gov/about/facts/research/Geriatric2014.pdf (last visited Feb. 5, 2016) (11 of the 212 applicants received geriatric release); Virginia Dep't of Corr., Geriatric Offenders Within the SR Population 7 (August 2012), http://vadoc.virginia.gov/about/facts/

---

[3] Code § 53.1-40.01 provides that

Any person serving a sentence imposed upon a conviction for a felony offense, other than a Class 1 felony, (i) who has reached the age of sixty-five or older and who has served at least five years of the sentence imposed or (ii) who has reached the age of sixty or older and who has served at least ten years of the sentence imposed may petition the Parole Board for conditional release. The Parole Board shall promulgate regulations to implement the provisions of this section.

research/geriatric/fy2011-geriatric-report.pdf (last visited Feb. 5, 2016) (3 of the 129 applicants received geriatric release). If these trends continue as juvenile offenders become eligible for geriatric release, it may become increasingly difficult to maintain that geriatric release as applied truly provides a "meaningful opportunity" for release.[4] However, we are not required to squarely address that question and the continuing vitality of Angel today because these defendants have not been denied geriatric release.

The General Assembly, which is the appropriate body to establish mechanisms for responding to Graham and its progeny, would be prudent to examine carefully the procedures currently governing juvenile sentencing and geriatric release in Virginia. The majority is correct to note the need for the General Assembly "to explore additional ways of calibrating the just aims of the criminal justice system to the unique circumstances of juvenile offenders." Ante at 13. Such mechanisms might include periodic sentence reviews for all prisoners whose offenses were committed as juveniles, see Cal. Penal Code §§ 1170(d)(2), 3051, or reinstating parole eligibility for juvenile offenders after a term of years, see Wyo. Stat. Ann. § 6-10-301(c).

In conclusion, I would hold that Graham's mandate prohibiting life sentences without parole for juvenile non-homicide offenders applies equally to de facto life sentences. However, because Virginia's geriatric release statute, if applied as written, is capable of providing juveniles with such sentences a meaningful opportunity for release as mandated by Graham, and review of its application to offenders sentenced as juveniles is not yet ripe, I concur in the Court's

---

[4] The geriatric release program was not implemented until 1994. See 1994 Acts (Sp. Sess. II) 1, 2 (enacting Code § 53.1-40.01). A hypothetical 17-year old sentenced to a life sentence or a de facto life sentence in 1995 will not be eligible for geriatric release until 2038. Moreover, inmates who committed their crimes before January 1, 1995 are still eligible for traditional parole. See Code §§ 53.1-151, 53.1-165.1. Accordingly, a number of inmates, who would be eligible for geriatric release, obtain release through traditional parole instead.

determination that his sentence does not violate the Eighth Amendment of the United States Constitution.