COURT OF APPEALS OF VIRGINIA

Present: Judges Huff, O'Brien and White
Argued by videoconference

ELIEJAH KHALID HASAN WILLIAMS

v.     Record No. 0018-22-1

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE KIMBERLEY S. WHITE
DECEMBER 13, 2022

FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
Bryant L. Sugg, Judge

(Joshua A. Goff; Goff Voltin, PLLC, on brief), for appellant.
Appellant submitting on brief.

William K. Hamilton, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


After a bench trial, the trial court convicted Eliejah Khalid Williams of abducting his minor

child, along with several other charges not at issue in this appeal. By final order entered December

31, 2021, the trial court sentenced Williams to fifteen years and seventy-two months'

incarceration with twelve years and seventy-two months suspended. On appeal, Williams asserts

that the trial evidence was insufficient to convict him of abduction because he was legally justified

in taking his daughter away from her mother's custody. We disagree, and therefore affirm his

conviction.

I.  BACKGROUND

Natalia Bueker testified that Williams is the father of her two daughters, A.W. and N.W. In

August 2020, A.W. was four years old and N.W. was two years old. Williams had been living with

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

UNPUBLISHED

Bueker and the children at her residence in Newport News for approximately two months. Williams spent the previous year living and working in New York. Williams and Bueker had lived together before he went to New York, and she asked him to return to Virginia because she had a heart condition and needed help watching the children. Williams did not maintain contact with Bueker and the children when he first moved to New York but subsequently resumed contact. Bueker and Williams did not have a custody order regarding A.W. and N.W. Bueker testified that she and Williams had agreed that they both "were going to be the parents and work together with these children" and would "coparent and split things, roughly, equally." However, Williams refused to sign the lease on their residence.

On August 5, 2020, Bueker returned from work and stopped outside the residence to say hello to a male neighbor. Williams stepped out of the residence and stated that the neighbor was not allowed to speak with Bueker. Bueker and Williams went inside the house and exchanged "very unpleasant" words. Williams broke an XBox video game console, and Bueker left the house with Williams's PlayStation video game console, intending to take it to the dump. Williams followed her outside and said "some terrible things." After having a "bad feeling," Bueker returned to the residence and, because Williams was "aggravated," shut the door before he entered.

Williams kicked in the front door and choked Bueker in the living room. A.W. and N.W. watched the attack from the upstairs landing and Bueker told them to go to their room. When Williams "smacked [Bueker] really hard" across her face, her vision blurred and she was "on [the] way to blacking out." Williams was cussing and "beyond angry."

After Williams smacked her face, Bueker ran upstairs and told the girls to hide in their room. Bueker shut herself and the girls in the bedroom; Williams kicked that door in, choked Bueker again, held a gun to her face, and cursed at her. Bueker believed that Williams was going to kill her. Williams then went downstairs but told Bueker that he would be back upstairs in five

- 2 -

minutes and "was going to take the girls with him." When Williams came back upstairs, he attempted to take N.W., but when he could not get her down the stairs, he took A.W. instead.

Bueker called 911; while she was on the phone, Williams took A.W. outside and attempted to put her in Bueker's vehicle. Bueker followed Williams outside and attempted to prevent him from putting A.W. in the vehicle because "it just didn't feel safe." The Commonwealth played the recording of Bueker's 911 call in court and Bueker identified gunshots heard on the recording. She acknowledged that she did not see Williams fire the weapon.

Williams and Bueker "fought back and forth" over A.W. While Bueker was holding A.W., Williams picked Bueker up and Bueker and A.W. "smacked the asphalt." Williams held the gun to Bueker's head again and demanded that she let him take A.W.; Bueker refused. Williams "eventually got [A.W.] into the vehicle" and locked the doors. Bueker tried unsuccessfully to break the window before Williams drove off with A.W. Williams never called Bueker to tell her where he was going with A.W.; a police officer later found A.W. in Chesterfield County.

Bueker's neighbor, Christopher Stevey, testified that he was inside his residence when he heard gunshots on August 5, 2020. When Stevey "went outside to see what was going on," he saw Bueker and Williams "running around a vehicle." Williams was putting A.W. in the car and Bueker was taking her out. Stevey called the police because Bueker was "screaming for help" and A.W. was crying.

After the Commonwealth rested, Williams moved to strike the evidence of all the charges. Regarding the charge that Williams abducted A.W., the defense argued that Williams and Bueker "did not have a custody order," "were living together as a coparenting household," and had "divided parenting tasks" and "financial responsibility equally." The defense further asserted that "without a custody order, each parent has pretty much absolute rights to transport" and "raise" his children as

- 3 -

he sees fit. Finally, Williams contended that there was no evidence that A.W. "felt that her liberty was in some way unlawfully restricted in a way that would not be allowed of a parent."

The trial court denied the motion to strike the evidence of the charge of abducting A.W. and subsequently convicted Williams of that offense, along with strangulation and six misdemeanor offenses not at issue in this appeal. Williams challenges only his conviction for abducting A.W.

## II. ANALYSIS

Williams contends that the trial evidence was insufficient to support his abduction conviction because "[w]hatever bad conduct Williams may have engaged in . . . , it cannot be disputed that removing a minor child from the scene of this dispute was undoubtedly legally justifiable."

To the extent that Williams's argument raises an issue of statutory interpretation, we review such issues *de novo*. *Eley v. Commonwealth*, 70 Va. App. 158, 162 (2019). "When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Smith v. Commonwealth*, 296 Va. 450, 460 (2018) (alteration in original) (quoting *Commonwealth v. Perkins*, 295 Va. 323, 327 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Secret v. Commonwealth*, 296 Va. 204, 228 (2018) (alteration in original) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)).

"If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the

- 4 -

finder of fact at the trial.'" *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)). "Under well-settled principles of appellate review, we consider the evidence presented at trial in the light most favorable to the Commonwealth, the prevailing party below." *Vay v. Commonwealth*, 67 Va. App. 236, 242 (2017) (quoting *Smallwood v. Commonwealth*, 278 Va. 625, 629 (2009)).

Virginia's abduction statute "combines the common law offenses of kidnapping, abduction, and false imprisonment 'into one statutory felony.'" *Clanton v. Commonwealth*, 53 Va. App. 561, 567 (2009) (en banc) (quoting *Walker v. Commonwealth*, 47 Va. App. 114, 120 (2005)). To convict Williams of abducting A.W., the Commonwealth was required to prove that he took and transported A.W. by force or intimidation "with the intent to deprive [her] of [her] personal liberty or to withhold or conceal [her] from any person, authority or institution lawfully entitled to [her] charge." *Id.* at 568 (quoting Code § 18.2-47). The Commonwealth also had to prove that Williams acted without "legal justification or excuse." *Burton v. Commonwealth*, 281 Va. 622, 626 (2011).

Williams does not contest on appeal that he used force to put A.W. in the car and transport her from the residence, or that he did so with the intent to withhold her from Bueker, a custodial parent who was lawfully entitled to A.W.'s charge. Rather, he argues only that the Commonwealth failed to prove that he acted without legal justification because, as a "natural parent," he had an equal right to transport A.W. irrespective of Bueker's wishes.

This Court has determined that "[a]s applied to the facts contained in this record, we construe the statute to authorize the prosecution of a custodial parent for abduction of his child . . . ." *Diehl v. Commonwealth*, 9 Va. App. 191, 194 (1989). It is well-established that the abduction statute contains no categorical exception for parents. *See Taylor v. Commonwealth*, 260 Va. 683, 688 (2000). In *Taylor*, the Supreme Court of Virginia considered whether a

- 5 -

"natural father" abducted his ten-month-old son, who was born out of wedlock. *Id.* The

evidence showed that "[t]he father [and an accomplice] forcibly entered the home where the

child resided in the mother's lawful, physical custody." *Id.* The father "snatched the child in the

midst of a melee from his mother's control" and "transported him to Georgia with the obvious

intent to withhold him from the mother, who was lawfully entitled to his charge." *Id.*

The father's accomplice was convicted of abduction as a principal in the second degree

and sentenced to eight years' imprisonment. *Id.* at 686. On appeal, she contended that the

evidence was insufficient to convict her because there was no crime. *Id.* at 687. She argued that

the father had "lawful justification" to "take his own child and thus could not be guilty" of

abduction. *Id.* at 689. In rejecting this argument, the Supreme Court noted that "[a]t common

law, a father . . . shared no legal relationship whatever" with a child born out of wedlock. *Id.*

Our Supreme Court noted that "the harsh common-law rules on the subject of parental rights and

responsibilities regarding" children born out of wedlock "have been modified by statute and case

law." *Id.* Notwithstanding those changes, however, "upon birth of an illegitimate child, the right

of the natural mother to immediate custody is superior." *Id.*

The Supreme Court noted that the father in *Taylor* "had only a biological relationship,

and none other, with his child." *Id.* at 690. He was absent at the child's birth, had never

supported the child, and had not visited the child. *Id.* "The child had been in the physical

custody of the mother continuously since birth." *Id.* The Supreme Court held that the father's

"biological relationship" with the child did not give him "legal justification" to "forcibly tak[e]

the child from the mother's custody." *Id.* Further, the Supreme Court noted that the father "had

no actual relationship of parental responsibility." *Id.* The Supreme Court also explained that the

United States Supreme Court had stated, "in most cases, parental rights require enduring

- 6 -

relationships and do not spring full-blown from the biological connection between parent and child." *Id.* (citing *Lehr v. Robertson*, 463 U.S. 248, 260 (1983)).

Williams contends that *Taylor*, which he characterizes as "applying a different and outdated legal standard to married parents than unmarried parents," does not control the result in his case.[1] He asserts that the trial evidence established that he and Bueker "were coparenting" A.W. and N.W. and "had been sharing child rearing responsibilities in the days leading up to August 5, 2020." Accordingly, he contends, he and Bueker "were equal in the eyes of the law regarding their ability to parent their children" and he had an equal right to "transport his child."

Williams is correct that the facts in this case differ from those in *Taylor*. Williams has shown that he has exhibited a greater degree of parental responsibility in his children's lives than the father in *Taylor*. We disagree, however, that the facts here compel a different legal result from *Taylor*. The Supreme Court based its holding on the fact that "parental rights require enduring relationships," not solely a biological connection. *Taylor*, 260 Va. at 690. Viewed in the light most favorable to the Commonwealth, the trial evidence established that Williams had largely been absent from A.W.'s life for at least a year before reentering her life for two months at the mother's invitation. Williams argues that the absence of a court order altering his rights as a natural parent supports his assertion that he had legal justification to transport A.W. against Bueker's wishes. While "there shall be no presumption or inference of law in favor of either" parent regarding custody determinations, Code § 20-124.2(B), Williams has not established that he's done enough to warrant parental rights equal to Bueker's. This is especially so considering the physical altercation Williams instigated precipitating the taking.

---

[1] To the extent that Williams implies that *Taylor* is no longer binding precedent, he has cited no case from the Supreme Court overruling, abrogating, or limiting it.

We conclude that the approximately two months that Williams lived with Bueker and the children while sharing parenting responsibilities did not bestow upon him parental rights equal to Bueker's. Any relational equity that Williams built up with his children through his recent return to coparent was inadequate to establish equal parental rights with Bueker under the circumstances presented in this case. *See Taylor*, 260 Va. at 689-90. To the extent that Williams exercised a degree of parental authority over A.W. during that time, that authority was initiated and delegated by Bueker. The authority that Bueker gave Williams to help her care for and raise A.W. during that short period did not legally empower him to take or transport A.W. in contravention of Bueker's own parental rights. Accordingly, Williams's status as A.W.'s biological father did not legally justify his forcibly taking A.W. with the intent to withhold her from Bueker. *See id.*

Apart from Williams's argument that his status as A.W.'s biological father legally justified his actions, he also contends that he was legally justified in "removing a minor child from the scene of this dispute." We again disagree. "A 'legal justification' is a 'lawful . . . reason for one's acts or omissions.'" *Brown v. Commonwealth*, 74 Va. App. 721, 735 n.10 (2022) (alteration in original) (quoting *Taylor*, 260 Va. at 690). The evidence taken in the light most favorable to the Commonwealth shows that after Williams and Bueker got into a heated verbal argument, he kicked in the front door, choked Bueker, "smacked" her hard across the face, chased her upstairs, kicked in a bedroom door, held a firearm to her head, cussed at her, and later discharged the firearm. A rational factfinder could conclude that removing A.W. from the danger and trauma caused by Williams's own unlawful actions was not a lawful reason to forcibly withhold A.W. from her mother's custody. Williams does not contest that the trial evidence was insufficient to establish the other elements. Thus, the trial court's verdict was proper.

## III.  CONCLUSION

For the foregoing reasons, we affirm Williams's conviction for abduction.

*Affirmed.*