UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:   Judges O'Brien, Malveaux and Callins
Argued at Alexandria, Virginia


LASZLO PENTEK

                                                    MEMORANDUM OPINION* BY
v.        Record No. 0971-21-4                JUDGE MARY BENNETT MALVEAUX
                                                    AUGUST 30, 2022

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Daniel E. Ortiz, Judge[1]

George L. Freeman, IV, for appellant.

Katherine Quinlan Adelfio, Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


Laszlo Pentek ("appellant") was convicted in a jury trial of first-degree murder, in

violation of Code § 18.2-32, and use of a firearm in the commission of a felony, in violation of

Code § 18.2-53.1.  On appeal, he argues the trial court erred in denying his motion to strike the

evidence, for two reasons:  (1) because the evidence did not exclude every reasonable hypothesis

of innocence and did not demonstrate that he committed an act which caused the victim's death,

and (2) because the evidence was insufficient to prove that he used a firearm in the commission

of a murder.  For the following reasons, we affirm the trial court.


---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Judge Ortiz was subsequently elected to this Court.  He did not participate in the
consideration or resolution of this appeal.

## I. BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, the prevailing party at trial." *Carter v. Commonwealth*, 300 Va. 371, 374 (2021) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381 (2016)). "On appeal, we discard any of appellant's conflicting evidence, and regard as true all credible evidence favorable to the Commonwealth and all inferences that may reasonably be drawn from that evidence." *Walker v. Commonwealth*, 74 Va. App. 475, 481 (2022).

### The Shootings

In January 2017, appellant and his wife, Donna Pentek, had been married for about fifteen years. The couple shared a home together with their fourteen-year-old daughter, T.P., and their younger son, K.P.[2]

At approximately 3:30 p.m. on January 6, 2017, T.P. returned home from school. When she let herself into the home, T.P. heard her father, appellant, yelling, "Call 9-1-1. Call an ambulance." Appellant was in the bathtub in the upstairs bathroom.

T.P.'s 911 call was recorded and played for the jury at trial. T.P. initially told the dispatcher, "My dad—I just came home from school and he's in the tub and he's hurt." Asked if anyone was with her father, T.P. replied, "My mom's here, I'm just getting her up now, she was sleeping I think." T.P. testified that she did not mean that she was attempting to get Donna up; rather, she was at the bathroom door and "was starting to walk towards [her] mom."

When T.P. entered Donna's bedroom, she "touched her [mother] on the left arm. As if [she] were going to wake her." T.P. then exclaimed, "Come! Fast! Please! . . . [T]here's something seriously wrong with my mom." Asked what was wrong with her mother, T.P.

---

[2] To protect the children's privacy, we use initials rather than their names.

- 2 -

replied, "I don't know—there's a pool of blood next to her. I do not know what happened—my dad's in the bathtub, like, yelling."

The dispatcher asked where Donna was "bleeding from," and T.P. responded, "Her head. . . . There's some red spot on the side of her left head [sic] and right next to her, it looks like there's a pool of blood. . . ." Asked if there was a gun near her mother, T.P. replied, "I don't know. . . . Um . . . um . . . yes." T.P. testified that there was "some kind of comforter" near her mother and that she had moved it "slightly" or "a little bit" to look for a gun. However, neither in touching her mother nor in moving the comforter did T.P. get any blood on her hands.

T.P. told the dispatcher she would go and check on her father, and then stated, "He's sitting in the bathtub . . . sitting in a bathtub of blood, he's holding on to his belly, um, and there's four gunshots into the, uh, uh, into the bathroom wall. My mom looks like she's dead." The dispatcher asked T.P. to ask appellant what had happened. When T.P. did so, appellant replied, "Oh my God, help me, please."

Officers from the Fairfax County Police Department soon arrived at the home. Officer Jacob Jackson entered the master bedroom and saw Donna lying on the bed. He checked her neck for a pulse but found none. Jackson later testified that police officers did not touch any items near Donna's body, because she was clearly dead. Jackson then moved to the bathroom, where he found appellant lying in a bloody bathtub. Jackson noted a small puncture wound in appellant's abdomen and called for medical assistance.

Minhtoan Nguyen, a technician with the Fairfax County Fire and Rescue Department, testified that he arrived at the home and checked Donna's left wrist for a pulse. In doing so, he stated, he did not have to move Donna because her left wrist "was readily available."

Another police officer, Courtney Young, entered the master bedroom but did not touch Donna's body. Young then stationed himself in the bedroom to ensure that no one disturbed the

room until crime scene investigators could "document the scene . . . as it was." Young testified that during this time, no one moved Donna's body.

Appellant was taken to the hospital and treated for a gunshot wound to his lower left abdomen, an injury to his left leg, and a laceration between the fingers of his left hand.

The Physical Evidence in the Home

At trial, the Commonwealth introduced into evidence numerous photographs of Donna's body and the master bedroom where she was found. The photographs depicted Donna lying on the bed on her right side with a white comforter covering her abdomen and legs. Her right arm lay beneath her head and extended straight out across the bed. Donna's upper left arm lay along her side, and her lower left arm was folded across her abdomen. Her left hand was tucked partway under her body with a pistol in its palm. That hand was covered in blood, which was smeared across both the hand and left forearm. There was also blood on Donna's left palm beneath the grip of the pistol. An iPad was propped on the bed in front of Donna's face. Donna's left temple exhibited a gunshot wound and a large pool of blood covered the bed beneath and around Donna's upper body.

Detective Sherry O'Brien, the lead crime scene detective who investigated the shootings, testified at trial as an expert in crime scene documentation and investigation, including blood pattern and stain analysis, and in bullet or projectile trajectories. When she entered the master bedroom, O'Brien noted that some things "were just kind of catching me as odd," including "Donna's body and how she's positioned and some of the bloodstain." O'Brien explained that had the pistol been in Donna's hand when her hand fell to the bed, the blood would have pooled around the gun and there would have been a "void," or blood-free area, "in the hand under the gun." O'Brien noted that there was blood on both the back of Donna's left hand and her left palm and concluded that Donna's left hand "at some point was in contact with a blood source.

And then . . . it was moved out of that blood source." Thus, it appeared to O'Brien "that the firearm was placed in the hand and then [the hand was] placed in that position," with "the tip [of the firearm] kind of under her stomach a little."

O'Brien further testified that Donna's left thumb was "kind of saturated [in blood] on top of the firearm" and that "the thumb [had been] placed on top," because "gravity kicks in. [Blood] goes down. It doesn't go[ ] up." Thus, it was inconsistent with the pooled blood that "you have lack of blood on the firearm with a bloody source on top of that firearm." O'Brien also noted a bloodstain on the back of Donna's forearm and stated that "[a]t some point something that was bearing blood came in contact with the forearm." This fact was also inconsistent with the pistol having been in Donna's hand when it dropped to the bed because "the blood would have just pooled around [the pistol]; it wouldn't have traveled up her arm." O'Brien opined that the bloodstain evidence was inconsistent with the position in which Donna had been found. She stated that "[a]t some point [Donna's] hand was in contact with some blood source," but "that [it] was removed from the blood source and placed in this position, because it doesn't make sense to be in this position with how the scene is laid out." O'Brien also opined that "at some point . . . the firearm was moved." No fingerprints were found on the pistol.

The Commonwealth also introduced into evidence numerous photographs of the bathroom. O'Brien testified that police officers found four "defects," or "abnormalit[ies] . . . like a [projectile] hole," in the wall above the bathtub. The hole that was lowest on the wall and thus closest to the side of the bathtub exhibited "some red stain that's consistent with blood [and] some tissue." There were also two holes in the outside edge of the bathtub and one in the bottom of the bathtub. When police officers drained the bloody water from the bathtub, they found a pistol.

Detective John Vickery, Jr. of the Fairfax County Police Department was the lead investigator for the shootings. He testified that he located an open gun safe in appellant's bedroom, which was a different room than the master bedroom. Appellant later acknowledged that the safe was his and had been used to store two Glock handguns. Police officers also found bankruptcy documents in the couple's living room.

Detective Jason Friedman of the Fairfax County Police Department testified at trial as an expert in digital forensics. He stated that he had examined the iPad that was propped in front of Donna and determined what applications had been running on the device. They included a calendar displaying children's athletic practices scheduled for January 6, 2017, an email application, a child's geometry assignment on Blackboard.com, and a novel.

The Evidence of the Injuries

Dr. Jocelyn Posthumus, an assistant chief medical examiner for the Virginia Department of Health's Office of the Chief Medical Examiner, testified at trial as an expert in forensic pathology. Posthumus stated that she conducted Donna's autopsy and that Donna's cause of death was a contact gunshot wound to the left temple. She explained that such a wound indicated that the firearm was in direct contact with the skin when it was fired. Although Donna had not died instantaneously from the gunshot, she had been rendered unconscious.

Posthumus noted that Donna had bloodstains on her left hand and forearm that were "transferred or smeared bloodstain pattern[s]." She indicated that she would not expect to see such bloodstains if someone fired a gun and then dropped their hand, because such bloodstains "indicate that there was already a pool of blood present . . . that [the] hand would have fallen on." She also indicated that such bloodstains could be created if the blood was "transferred in some other manner." Posthumus further testified that there was smeared blood on the "palmar surface" of Donna's left hand, as well as on the outsides of her fingers. She noted that she would

not have expected to see such blood had someone fired a gun and their hand had then dropped. Posthumus explained that due to the nature of Donna's injuries, she would not have been capable of voluntary movements and would not have experienced seizures; yet the smeared blood on Donna's palm and fingers was such that Posthumus "would not expect to see [it] without any other movements." Further, a wound like Donna's would be expected to produce "little droplets of blood" or a "mist-like deposit" on the hand that fired the gun, but "[t]here [was] no indication of any droplets here." Instead, the blood was "all smeared."

Posthumus also testified that in "the vast majority of cases," self-inflicted contact gunshot wounds are inflicted using the person's dominant hand. She also noted that in Donna's case, there was no known prior medical history of depression or suicidal ideation.

Dr. Ann Rizzo, a trauma surgeon at Inova Fairfax Hospital, treated appellant on January 6, 2017, and thereafter. She qualified at trial as an expert in trauma diagnosis and treatment. Rizzo testified that appellant presented with a penetrating injury to his left torso that encompassed several injuries to his small bowel and colon. Rizzo also noted a laceration between two fingers of appellant's left hand and an injury to his left leg. Rizzo removed a bullet fragment from appellant's left leg or foot. She testified that "there w[ere] some powder burns . . . on that leg, which would mean that . . . the gun was very close to the leg when it was fired."

Rizzo determined that appellant's abdominal injury had resulted from a gunshot wound to his lower left side. She described the wound as "a through and through" with "a hole in the front, and a hole in the back." Rizzo noted that with a gunshot wound "straight in the middle of your abdomen, you have a higher chance of bleeding to death than if you aim at the side of [the] abdomen, which just contains fat mostly." She testified that there w[ere] no powder burns on the wound, but that she would not expect to see such burns if the gun that caused the wound had been fired in water. This was because "[w]ater dissipates the force of the bullet . . . [and]

dissipates the powder that comes out with the bullet." Rizzo also stated that the laceration on appellant's left hand could have been caused by a bullet passing between his fingers. Following surgery, appellant was in a responsive state but "didn't answer any questions about the event" and "seemed very distant about [it]. And he never really talked about his family or anything else."

Dr. William Hauda, II, an emergency and forensic physician at Inova Fairfax Hospital, also testified at trial after qualifying as an expert in forensic medicine. He reviewed approximately twenty-eight photographs of the gunshot wound to appellant's left leg. Hauda stated that the photographs depicted "gray, small spots" that were "embedded in the skin" near the wound. He described the "dots . . . in the skin" as "exactly the appearance we see with gunshot residue when the flake[s] of gunpowder actually embed themselves in the skin." Hauda opined that the spots indicated that the bullet could have been fired at close range, within centimeters from the skin, and at most had been fired from up to "about three feet away."

Hauda also opined that the laceration between the two fingers on appellant's left hand could have been caused by the operation of the slide mechanism of a firearm or by a bullet passing between the fingers. The latter instance could occur "with you holding . . . the barrel of the gun . . . because of the skin that's in front of the barrel."

Appellant's Account of Events

On January 9, 2017, Detective Vickery interviewed appellant. An audio recording of the interview was played for the jury at trial. Vickery asked appellant what he had been doing before he was shot, and appellant replied that he had been soaking in the bath to ease the discomforts of his ulcerative colitis. He stated that Donna had been working from home that day and explained that she usually worked at her desk in the upstairs bedroom, which was near the bathroom. While appellant was "dunk[ing] his head backwards" to wash shampoo out of his

hair, he experienced a leg cramp. He had soap in his eyes and "couldn't see . . . and was just yelling" from the pain of the cramp. Then his ulcerative colitis "kicked in, . . . like a boom" and appellant "hit the back of my head on the tub or something." Appellant thought he had "passed out for a little bit or something, and then I was yelling for help, and I was in a lot, a lot of pain. And then, I'm not sure, somebody was there, I heard voices, and I think I woke up in a hospital after that." Someone in the hospital told appellant that he had been shot in the stomach and leg.

Appellant told Vickery that due to his ulcerative colitis he had not worked for approximately two years. His wife worked as a paralegal. Asked how "things [were] at home," appellant replied, "They're a little bit dysfunctional." Appellant acknowledged that there were "financial problems" and that things "haven't been going very well in that regard." Since appellant had not been working, Donna had taken over their finances but that "hasn't been very good; we're in dire straits." Appellant said that Donna had recently filed for bankruptcy and that he had just found out about the filing. He had told Donna that she should "tell [him] ahead of time about these things." Donna had given appellant a copy of the relevant documents, and although he had been unable to go through all of them, he had sat down with Donna "a couple of times" to review them and ask questions. Appellant stated his concern that Donna had undervalued their home and that the couple's circumstances were "not a bankruptcy in the true sense" but rather that they were "illiquid." Appellant said that the proper solution would have been for the couple to reduce their expenses and downsize to a smaller home and mortgage and that was what "she needed to do, but she was kind of reluctant to do that. Stubborn in some ways, but, you know. . . ." Appellant also stated that Donna could "from time to time . . . be stupid." He acknowledged that he and Donna slept in separate rooms but attributed the reason for doing so to his ulcerative colitis.

Appellant told Vickery that he kept two gun safes in his bedroom and that one contained rifles and the other contained two Glock pistols. Asked when he had last looked at his pistols, appellant paused for several seconds before replying, "Um, I don't know. I might have had [one] in the car on Friday," the day of the shootings. Appellant acknowledged that he had taken his son to school that day and said that a gun "might have been in there [in the car], yeah." He further stated that he had taken the gun upstairs with him when he returned home and that he would have put it in one of the safes. Appellant said that he accessed that safe with a key he usually kept on his person, but that both safes were also accessible via combination locks and Donna knew the combinations. When discussing whether Donna ever accessed the safes or used firearms, appellant asked Vickery, "Did she shoot somebody?" Appellant also told the detective that he is right-handed, "usually."

Appellant said that prior to his bath, he and Donna had looked at bankruptcy documents together while having lunch. He reiterated his concern that Donna had "filed for bankruptcy without saying anything to me." When Vickery asked whether appellant and Donna had discussed getting a divorce, appellant replied, "Not exactly." Donna had not stated "outright" that she wanted a divorce, but appellant thought that "her actions are strange if she's doing this kind of [bankruptcy] thing." Appellant said that his mother had cautioned him that Donna would "grab [his] stuff and leave." Asked whether he was angry that Donna might be seeking a divorce, appellant stated that he was "disappointed." He denied that Donna had ever said she wanted to hurt herself or had ever attempted to hurt herself.

Vickery also asked appellant if he had seen anyone or anything suspicious when he returned home on Friday, and appellant stated, "No." Vickery then asked, "What have you been told has happened, by your family?" Appellant replied, "They said to me that I had been shot. . . . And then they said that Donna had passed on." When Vickery told appellant that

Donna had been shot, appellant asked, "Why? Who did it?" Vickery asked appellant, "Who would do something like that to [Donna]," and appellant responded, "I don't know. There's jerks everywhere."

Asked whether he had heard anything while he was in the bathtub, appellant replied, "I don't know. I don't know." When Vickery queried appellant about why there would have been a gun in the bathtub with him, appellant responded, "There wouldn't be one." Informed by Vickery that there had been a gun, appellant replied, "How'd it get there? . . . I don't know." Appellant asked what kind of gun it had been and was told, "It was your Glock." Appellant replied, "Mine?" He then asked the detective, "How did Donna die?" When told again that she had been shot, he asked, "With what?" When Vickery said, "With a Glock," appellant said, "That doesn't make sense."

Vickery then asked appellant if he had killed Donna, and appellant said, "No! Why would I do that? I loved her." Appellant also denied having shot himself. When the detective referred to how people "who get in dire straits tend to act sometimes," appellant returned to the issue of the bankruptcy and stated, "she wasn't bankrupt, there's a difference. There's insolvent, and she's not even insolvent. . . . She's just illiquid!" Appellant then said, "All you have to do is sell the house to pay off all your debts, and if you pay off all your debts, you're back to square one. But you got to do that the smart way, that's all! . . . Course, some people just don't listen!"

When Vickery asked appellant how angry he had been with Donna about the bankruptcy on the day of the shootings, appellant denied that he had been angry. Rather, he said, he had been "frustrated. I knew she wasn't gonna say a whole lot, and she was gonna be playing her games." Appellant denied that there had been an argument but said that when he had asked Donna what her plan was, "she said, 'Don't worry, it's taken care of. Everything's taken care of.

Everything's taken care of, everything's fine and dandy.'" Appellant had replied, "Well, that's not how things have gone so far."

Vickery then returned to the subject of appellant's bath, and asked appellant again if he had heard anything or heard anyone come into the bathroom. Appellant then stated that, "when my leg was hurting, I thought I heard somebody. . . . I think there was someone there but I didn't see who it was. My eyes were hurting, and then I think I blacked out or something because I hit my head." Asked again what he thought had happened, appellant replied, "I'm not sure."

At trial, the jury also heard the testimony of Mehagen McRae, an attorney who represented Donna's niece and her husband when they sought custody and visitation of T.P. and K.P. in 2018. McRae stated that during a court proceeding that spring, appellant had testified that he learned of Donna's bankruptcy filing before her death and "didn't understand why it was fil[ed] the way that it was." Appellant believed that he had more of an understanding of bankruptcy than Donna and had had a conversation with her about the bankruptcy on the day of the shootings. On cross-examination in the custody and visitation proceeding, appellant had further stated that he did not hear any noises similar to gunfire on the afternoon of the shootings. Appellant also testified that T.P.'s routine was to come home from school around 3:15 p.m.

<u>Evidence of the Family Relationships</u>

The Commonwealth entered into evidence three audio recordings from Donna's phone. These recordings, which were played for the jury, captured some of appellant's interactions with his family. In the first recording, appellant berated Donna for failing to clean up the back porch, which appellant said should have been done "Weeks ago! . . . Lazy ass mother-fucker. . . . It's supposed to be done." In the second recording, appellant stated, "Shut the door, you fuckin' animal." When Donna said, "I am shutting the door," appellant replied, "Mother-fucking idiot." He then berated his family members, stating, "All I ask is that you fucking clean up. You can't

fucking do it. You won't fucking do it. Do a half-assed job, do it with a fucking attitude. . . . Lying bastards!" Appellant later shouted, "Shut the door! Fucking pig!" In the third recording, appellant shouted at T.P., telling her, "How ridiculously stupid are you? . . . You've become like your mother, being stupid all the time!"

Lewis Carroll knew the Penteks for approximately twenty-five years. He testified that over time, a "sort of a chilled aspect" developed in the Penteks' relationship and he began to see them together less and less often. In late 2014 or early 2015, Carroll became aware of financial problems affecting the Penteks. Carroll was party to a telephone conversation in which appellant "basically placed all blame for the financial situation they were in on [Donna]. . . . [H]e said . . . that she was responsible for incurring a very large amount of debt . . . [a]nd that, you know, it was her fault, and she needed to basically figure a way out of it." Appellant "did not feel any need to assist." Appellant also called Donna, who was a party to the conversation, "stupid" and "a couple of other names that just really was not . . . appropriate for the tone of the conversation." Appellant's overall tone was "not pleasant."

Carroll further testified that in his conversations with appellant around 2015, appellant "had nothing positive, nothing good to say about Donna. He often used foul language associated with her . . . . He called her bitch, he called her a fat slob, he called her a variety of different names." Appellant also told Carroll that he had been married before and "would not go through another divorce." Carroll stated that he also occasionally discussed the marriage with Donna. She related to Carroll that "[s]he felt very trapped in the marriage" but would not leave appellant, in part because she did not want to separate the children. In addition, Donna was "fearful of [appellant] because he basically was—she felt trapped."

Camilla Perry, one of Donna's supervisors at work, testified that around the time of Donna's death, Donna "often came to the office and appeared disheveled. She often looked like

she was under pressure." Perry also stated that around January 5, 2017, Donna told her that she planned to work from home on January 6 but that she would later return to the office. Perry also testified that she and Donna exchanged emails on January 6 and that Donna informed Perry that she had "logged in" from home and was going to begin her workday. Perry stated that she believed Donna had been working at least "until approximately 2:42 [p.m.] because that is the last time that a folder was created in her shared workspace on the shared drive for our division."

Shawn Hartley, another coworker, testified that Donna occasionally talked about wanting to get her own apartment with her children. Hartley became aware that the Penteks' financial situation "was not particularly good" and knew that Donna was thinking about leaving her marriage.

Tina Bradley testified that she had worked with Donna for more than twenty-five years and that Donna had become "[her] sister and [her] best friend." Bradley stated that at work, she frequently heard "[appellant] on the phone yelling at [Donna]." When Bradley asked Donna why she remained with appellant, Donna told her that "she was doing it for the kids." However, by 2016, Donna had begun thinking about leaving the marriage. Bradley did not know Donna to have had any mental health issues throughout their relationship. Bradley also testified that Donna had been right-handed.

The Commonwealth introduced into evidence a December 2, 2016 Facebook message from Donna to her sister, in which Donna stated, "I'm going to be filing for divorce soon." It also introduced into evidence an email sent from Donna's personal account to her work account on December 29, 2016, with the subject heading, "Info on divorce." In her email, Donna stated that she had been looking for the family's passports and birth certificates but that "[w]hen I went to check on the folders they were removed and are not in the boxes. When I asked [appellant] if

he took them to his Mom's he denied it, but I overheard him telling [K.P.] not to tell me anything."

Appellant's Motion to Strike

At the conclusion of the Commonwealth's evidence, appellant moved to strike. He argued that the evidence was insufficient to exclude the reasonable hypothesis that Donna first shot appellant and then shot herself. Appellant also contended that the evidence was insufficient to prove that he had used a firearm to shoot Donna. The trial court denied the motion. Appellant then presented evidence and, after resting his case, renewed his motion to strike. The trial court denied the renewed motion.

The jury convicted appellant of first-degree murder and use of a firearm in commission of a felony. This appeal followed.

II. ANALYSIS

Appellant argues the trial court erred in denying his motion to strike because the evidence was insufficient to prove that he murdered Donna and that he used a firearm in the commission of her murder.

"In challenging the trial court's denial of his motion to strike, [appellant] necessarily asserts that the jury should not have been allowed to even consider the charges because '[a] motion to strike challenges whether the evidence is sufficient to submit the case to the jury.'" *Massie v. Commonwealth*, 74 Va. App. 309, 319 (2022) (last alteration in original) (quoting *Linnon v. Commonwealth*, 287 Va. 92, 98 (2014)). "As a result, [appellant's] challenge raises the question of whether the evidence adduced sufficiently presented 'a *prima facie* case [of the charged offenses] for consideration by the' jury." *Walker*, 74 Va. App. at 489 (quoting *Vay v. Commonwealth*, 67 Va. App. 236, 249 (2017)). "Our consideration of that question involves determinations regarding both the elements of the offenses and whether there was sufficient

- 15 -

evidence regarding each element so identified. The identity of the necessary elements presents a question of law subject to *de novo* review." *Massie*, 74 Va. App. at 319. "Whether the evidence adduced is sufficient to prove each of those elements is a factual finding, which will not be set aside on appeal unless it is plainly wrong." *Vay*, 67 Va. App. at 249 (quoting *Linnon*, 287 Va. at 98). "In reviewing that factual finding, we consider the evidence in the light most favorable to the Commonwealth and give it the benefit of all reasonable inferences fairly deducible therefrom." *Linnon*, 287 Va. at 98 (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 224 (2013)). "After so viewing the evidence, the question is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Lawlor*, 285 Va. at 224 (quoting *Commonwealth v. McNeal*, 282 Va. 16, 20 (2011)). "In sum, if there is evidence to support the conviction, the reviewing court is not permitted to substitute its judgment, even if its view of the evidence might differ from the conclusions reached by the finder of fact at the trial." *Linnon*, 287 Va. at 98 (quoting *Lawlor*, 285 Va. at 224).

Appellant specifically argues that the trial court erred in denying his motion to strike because the evidence did not exclude every reasonable hypothesis of innocence and did not demonstrate that he committed an act that caused Donna's death. He contends that what occurred prior to T.P.'s arrival home is unknown and thus the evidence fails to establish "what role, if any," appellant had in Donna's shooting. Accordingly, because the evidence does not "eliminate the possibility that [Donna] shot herself,"[3] the "theory of [appellant's] innocence is

_____

[3] On brief, appellant also hypothesizes that an unknown third party may have shot and killed Donna. However, appellant waived this argument in the trial court. When renewing his motion to strike, appellant argued his hypothesis that Donna "shot herself, and shot [appellant] before she shot herself." The trial court responded by asking, "What evidence is there that she shot him?" Appellant replied, "Well, there was [sic] two people in the home, and I think the Commonwealth has excluded anyone else being in the home." Thus, in arguing his motion to strike, appellant specifically disclaimed any hypothesis that a third party was the shooter and, in so doing, invited the court to rule by considering only the evidence that either Donna or appellant was the shooter. Accordingly, to the extent that appellant now argues the trial court erred in

- 16 -

just as plausible as the theory of [his] guilt." Appellant also argues that because the evidence

does not establish that he committed any act against Donna, it is insufficient to establish that he

utilized a firearm in the commission of a felony. Based on these arguments, on appeal, appellant

challenges only whether the evidence adduced at trial sufficiently presented a *prima facie* case

for one element of the charged offenses: the identity of the fatal shooter.[4] *See Walker*, 74

Va. App. at 502 (noting that "the identity of the perpetrator always will be an element of the

offense that the government must prove to a jury beyond a reasonable doubt").

"Elements of a crime may be proved by direct or circumstantial evidence." *Lambert v.*

*Commonwealth*, 70 Va. App. 54, 65 (2019). Circumstantial evidence "is as competent and is

entitled to as much weight as direct evidence," and "[w]hile no single piece of evidence may be

sufficient, the combined force of many concurrent and related circumstances . . . may lead a

reasonable mind irresistibly to a conclusion." *Williams v. Commonwealth*, 71 Va. App. 462,

484-85 (2020) (second alteration in original) (first quoting *Breeden v. Commonwealth*, 43

Va. App. 169, 177 (2004); then quoting *Commonwealth v. Moseley*, 293 Va. 455, 463 (2017)).

However, circumstantial evidence must be "sufficiently convincing to exclude every reasonable

hypothesis except that of guilt." *Banks v. Commonwealth*, 67 Va. App. 273, 291 (2017) (quoting

*Breeden*, 43 Va. App. at 177). "The Commonwealth, however, 'need only exclude reasonable

---

denying his motion to strike because the evidence did not exclude his hypothesis of innocence that an unknown third party shot Donna, that argument is waived by operation of the invited error doctrine. *See Nelson v. Commonwealth*, 71 Va. App. 397, 404 (2020) ("The invited error doctrine allows an appellate court to consider errors of law as waived when a party 'attempt[s] to take advantage of the situation created by his own wrong.'" (alteration in original) (quoting *Cangiano v. LSH Bldg. Co., L.L.C.*, 271 Va. 171, 181 (2006))); *Rowe v. Commonwealth*, 277 Va. 495, 501-02 (2009) (declining to reach the merits of an assignment of error "because [the appellant] invited the very error of which he now complains").

[4] Accordingly, we do not consider the sufficiency of the evidence of the remaining elements of the offenses. *See Fields v. Commonwealth*, 73 Va. App. 652, 674 (2021) (discussing the other elements of first-degree murder); *Jones v. Commonwealth*, 70 Va. App. 307, 333 (2019) (*en banc*) (discussing the other elements of use of a firearm in commission of a felony).

- 17 -

hypotheses of innocence that flow from the evidence, not those that spring from the imagination of the defendant.'" *Young v. Commonwealth*, 70 Va. App. 646, 653 (2019) (quoting *Simon v. Commonwealth*, 58 Va. App. 194, 206 (2011)). "The reasonable hypothesis principle . . . is 'simply another way of stating that the Commonwealth has the burden of proof beyond a reasonable doubt.'" *Rams v. Commonwealth*, 70 Va. App. 12, 28 (2019) (alteration in original) (quoting *Moseley*, 293 Va. at 464). "The fact finder 'determines which reasonable inferences should be drawn from the evidence[] and whether to reject as unreasonable the hypotheses of innocence advanced by a defendant.'" *Young*, 70 Va. App. at 654 (alteration in original) (quoting *Moseley*, 293 Va. at 464). "Consequently, whether the evidence excludes all reasonable hypotheses of innocence is a 'question of fact,' and like any other factual finding, it is subject to 'revers[al] on appeal only if plainly wrong.'" *Id.* (alteration in original) (quoting *Thorne v. Commonwealth*, 66 Va. App. 248, 254 (2016)).

"When examining an alternative hypothesis of innocence, the question is not whether 'some evidence' supports the hypothesis, but whether a rational factfinder could have found that the incriminating evidence renders the hypothesis of innocence unreasonable." *Vasquez v. Commonwealth*, 291 Va. 232, 250 (2016). Thus, while "[i]t is true that a factfinder cannot 'arbitrarily' choose, as between two equally plausible interpretations of a fact, one that incriminates the defendant[,] [t]he choice becomes arbitrary . . . only when no rational factfinder could believe the incriminating interpretation of the evidence and disbelieve the exculpatory one." *Id.* (citations omitted). Accordingly, "[m]erely because [a] defendant's theory of the case differs from that taken by the Commonwealth does not mean that every reasonable hypothesis consistent with his innocence has not been excluded." *Ray v. Commonwealth*, 74 Va. App. 291, 308 (2022) (alterations in original) (quoting *Edwards v. Commonwealth*, 68 Va. App. 284, 301 (2017)).

Appellant's hypothesis of innocence is that Donna shot appellant and then shot herself with the firearm that was found in her left hand. We conclude that a rational factfinder could have found that the incriminating evidence rendered this hypothesis unreasonable.

The evidence adduced at trial, viewed in the light most favorable to the Commonwealth, demonstrated that Donna was right-handed but was found with a gun in her left hand. Dr. Posthumus, who conducted Donna's autopsy and testified as an expert in forensic pathology, noted that in the vast majority of cases, self-inflicted gunshot wounds are inflicted using the shooter's dominant hand. Posthumus also testified that bloodstains on Donna's left hand and forearm were "transferred or smeared" and that these bloodstains were inconsistent with those that would have resulted from a person firing a gun and their firing hand then falling. Further, there was smeared blood on Donna's left palm beneath the firearm and on the outsides of her fingers, which was also inconsistent with such a series of events. Posthumus testified that she would not have expected to see smeared blood on Donna's palm or fingers unless she had engaged in additional movements after being shot; however, the nature of Donna's head wound was such that Donna would not have been capable of voluntary movements and would not have experienced seizures. Photographs of Donna's body and the gun also demonstrated that the tip of the gun was positioned slightly under Donna's abdomen.

Detective O'Brien, the lead crime scene detective who investigated Donna's death, also testified to aspects of the crime scene that were "odd," including the relationships between Donna's body, the bloodstains underneath and around her, and the gun. She explained that had the firearm been in Donna's hand when it was fired, and the hand had then dropped, she would have expected to find a "void," or blood-free area, under the gun. Noting the same bloodstains on the back of Donna's left hand and palm that were noted by Dr. Posthumus, O'Brien concluded that Donna's hand had been in contact with a blood source before being moved out of

that blood source; it appeared to her that the gun had been placed in Donna's hand before the hand was "placed in [its] position" with "the tip [of the firearm] kind of under the stomach a little." O'Brien also noted that Donna's left thumb, which was positioned on top of the firearm, was "saturated" in blood. She determined that the thumb had been placed on top of the weapon because "you have a lack of blood on the firearm [under the thumb] with a bloody source on top." Ultimately, O'Brien opined that the bloodstain evidence was inconsistent with the position in which Donna was found, that Donna's left hand had been placed in its position, and that the gun had been moved.

Further, the evidence adduced at trial did not demonstrate that Donna was suicidal. Dr. Posthumus testified that there was no known prior history of depression or suicidal ideation in Donna's case. Although the evidence demonstrated that the Penteks faced challenging financial circumstances and had had a difficult relationship in recent years, Donna had taken affirmative steps to address those challenges and difficulties. She recently had filed for bankruptcy and was making plans to initiate a divorce. Donna's coworkers testified to her ongoing concern for her children, and one of her supervisors testified that Donna was still working remotely at her job less than an hour before her body was discovered. When T.P. found her mother, she was reclined on her bed with an open iPad propped in front of her face. Forensic evidence demonstrated that the iPad was running several applications, including an email program, a novel, a calendar displaying children's athletic practice schedules, and a learning platform displaying a child's geometry assignment. This evidence, viewed in its totality, demonstrates that Donna was actively engaged with her life.

Appellant's hypothesis that Donna shot herself also fails to account for the shooting of appellant. Although appellant argued in his motion to strike that Donna first shot him before shooting herself, the evidence, viewed in the light most favorable to the Commonwealth, does

not support this assertion. Appellant repeatedly stated to police and others that he did not see or hear anyone prior to being shot and did not know who had shot him.[5] Additionally, while appellant attempted to demonstrate at trial that Donna was suicidal, and implied that she shot appellant as part of a murder-suicide, for the reasons discussed above the evidence does not support such an impulse and actions on Donna's part.

Instead, the circumstantial evidence supports the conclusion that, in fact, appellant was the person who shot Donna. The evidence adduced at trial demonstrated that appellant had a history of belligerence towards Donna and of belittling her to herself and others. One of Donna's supervisors testified that appellant frequently yelled at Donna on the telephone. A long-time family acquaintance was a party to phone calls with the Penteks in which appellant told Donna she was "stupid" and called her names that were "not . . . appropriate." The same acquaintance testified to telephone calls between himself and appellant in which appellant had "nothing positive" or "good to say about Donna." Appellant used foul language to refer to her, calling her a "bitch," a "fat slob," and other names. Recordings from Donna's phone, in which appellant berated her and called her a "Lazy ass mother-fucker," a "fuckin' animal," and a "Mother-fucking idiot" were also entered into evidence. Even during his interview with Detective Vickery three days after Donna's death, appellant stated that Donna could "be stupid."

_____

[5] Appellant did tell Detective Vickery towards the end of his interview that he "thought he heard somebody" and "th[ought] there was someone there" when he was struggling with cramps in the bathtub. However, these comments came after appellant repeatedly described his experience in the bathtub while omitting any such statements, and only after Vickery directly asked him whether he had killed Donna. Previously, appellant had consistently told Vickery that he did not know what had happened to him and how he came to have been shot in the bath. A reasonable trier of fact, confronted with this timeline and these inconsistencies in appellant's statements, could conclude that when appellant claimed that he might have heard or thought someone was in the bathroom before he was shot, appellant was lying to conceal his guilt. *See Poole v. Commonwealth*, 73 Va. App. 357, 369 (2021) (noting that a trier of fact is "at liberty to discount [a defendant's] self-serving statements as little more than lying" to conceal guilt (quoting *Becker v. Commonwealth*, 64 Va. App. 481, 495 (2015))).

During that interview, appellant also made clear that he knew of and was upset about Donna's recent bankruptcy filing. Appellant repeatedly returned to the subject of Donna's bankruptcy filing during the interview and stated that he believed it was an inappropriate course of action that would damage the family's financial situation. He also acknowledged to Vickery that he and Donna had looked at their bankruptcy documents together at lunch on the day Donna was shot. Appellant also told the detective that his mother had cautioned him that Donna might "grab [his] stuff and leave" him, and he told Carroll that he had been married before and "would not go through another divorce."

Appellant testified in his children's custody and visitation proceeding that T.P.'s routine was to come home from school each day at around 3:15 p.m. On January 6, 2017, T.P. came home at approximately 3:30 p.m. and found her mother lying in bed in a pool of blood and her father lying in a bathtub full of blood and water awaiting help. Dr. Rizzo, the trauma surgeon who treated appellant's injuries, testified that appellant had suffered a gunshot wound to his abdomen, a laceration between two fingers on his left hand, and an injury to his leg. Appellant's leg injury exhibited powder burns. Dr. Hauda, who testified as an expert in forensic medicine, also stated that appellant had gunshot residue embedded in his left leg from "a very close wound, meaning with[in] centimeters [of] the gun barrel." He further testified that the laceration between appellant's two fingers could have been caused by the operation of the slide mechanism of a firearm or by a bullet passing between the two fingers; the latter instance could occur "with you holding the barrel of the gun." There was no evidence at trial that appellant struggled with anyone who was pointing a firearm at him.

Viewing this evidence in its totality, a rational trier of fact could have found that appellant's hypothesis of innocence—that Donna committed suicide after first shooting appellant—was unreasonable and that in fact appellant shot Donna, attempted to shape the crime

scene to depict a suicide, and then fired shots in the bathroom and shot himself to conceal his guilt and implicate Donna. Thus, because a "rational factfinder could believe the incriminating interpretation of the evidence and disbelieve the exculpatory one," it cannot be said that the trial court erred in denying appellant's motion to strike and submitting appellant's case to the jury. *See Vasquez*, 291 Va. at 250. Further, it is self-evident under the facts and circumstances of this case that, if the evidence appellant murdered Donna was sufficient for that issue to be submitted to the jury, it was also sufficient for the issue of appellant's use of a firearm in the commission of the murder to be submitted to the jury.[6] Accordingly, we find no error in the trial court's denial of appellant's motion to strike.

### III. CONCLUSION

For the foregoing reasons, we hold that the trial court did not err in denying appellant's motion to strike. Thus, we affirm appellant's convictions.

*Affirmed.*

---

[6] At oral argument, appellant acknowledged the interrelationship of his two assignments of error.