COURT OF APPEALS OF VIRGINIA

Present:   Judges Huff,[*] Causey and White
Argued at Richmond, Virginia


STEPHEN OWEN CROTTS

v.      Record No. 1482-23-2

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[**] BY
JUDGE DORIS HENDERSON CAUSEY
FEBRUARY 11, 2025


FROM THE CIRCUIT COURT OF POWHATAN COUNTY
Paul W. Cella, Judge

(Robert J. Windle; Blackburn, Conte, Schilling & Click, P.C., on
brief), for appellant.  Appellant submitting on brief.

Matthew J. Beyrau, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


In a bench trial Stephen Owen Crotts was convicted in the Circuit Court of Powhatan
County of rape and assault and battery of MVV.[1]  The circuit court sentenced Crotts to prison for
a term of 20 years, with 12 years and 1 month suspended, on the rape conviction and 6 months,
all suspended, on the assault and battery conviction.  On appeal, Crotts argues that the evidence
was insufficient on the rape conviction because the testimony of the prosecutrix was inherently
incredible.[2]  Finding that Crotts failed to preserve his claim and that the prosecutrix's testimony
was not inherently incredible, we affirm.

---

[*] Judge Huff participated in the hearing and decision of this case prior to the effective
date of his retirement on December 31, 2024.

[**] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] The minor victim is referred to by her initials to preserve her privacy.

[2] Crotts concedes that the evidence was sufficient on his assault and battery conviction.

BACKGROUND

On November 16, 2020, MVV began dating Crotts. At the time MVV was 17 years old and Crotts was 16. The two dated for a year before breaking up. While dating, the two had a sexual relationship and each sent the other nude photographs of himself/herself. After they broke up, MVV dated other men including a 16-year-old named Cam.

On November 12, 2021, Crotts, who was unaware of any relationship between MVV and Cam, "showed up" at MVV's home and discovered her and Cam having sex. Crotts "got violent right away" and while Crotts cried and screamed, he placed Cam in a chokehold, to the point that Cam "could not breathe." MVV's friend Jordan Dudley was there with her boyfriend Logan, who tried to stop the attack. MVV got her cousin, who was nearby, "to break up everything that was happening." After MVV's aunt (with whom she lived) came home, they "all talked" and Crotts finally left.

On November 15, 2021, MVV was 18 years old and Crotts was 17. The two agreed to meet because Crotts "wanted closure on the whole Cam thing. So we were going to have sex one last time." About midnight Crotts drove in his mother's van to the end of the driveway of MVV's home, and she got in the passenger side of the van. They "started talking" and then Crotts began to hug and kiss her. MVV testified that despite her earlier agreement to have sex with Crotts "when it came down to it when he started hugging on me and kissing on me I did not. I said no." Crotts nevertheless pulled her into the backseat, took her pants off, and began to have oral sex with her. MVV again said "no," but Crotts put his penis "in and out of" her vagina. MVV testified that "he was getting upset with me for trying to fight him off of me. And I was screaming." When MVV said that "this isn't fair," Crotts responded that "this is what [you] get for the whole Cam situation. This is what you get. And this is what you deserve." In a manner that made "it hurt even more," Crotts grabbed MVV by the shoulder and "forcefully put his penis

further into [her] vagina." MVV continued to scratch and push, "doing all I could do to get him off. And he finally stopped because he couldn't enjoy it. That's what he said. I can't enjoy it."

When MVV then asked him if he would delete her nude pictures, Crotts replied that he would not. MVV was holding on to the car door as Crotts began to drive away, causing her to fall to the ground. Crotts stopped his van, and MVV got back in the passenger side. MVV blocked Crotts's attempt to punch her face, causing "a big welt" on her left arm. Crotts was "scared" that he had broken her arm. Crotts continued to hit MVV and strike her in the face as he drove away. Crotts stopped several miles away, and MVV got out of the van, but he put her back in it.

MVV then got a FaceTime video call from Dudley, who had received a text from MVV that Crotts had come to her home. Dudley used an app called Life360, which notified her that MVV had left her residence. During the FaceTime call MVV was "screaming and crying to help her" as Crotts hit her with her phone. MVV asked Dudley to call her aunt; she was asleep when Dudley tried to reach her. When Dudley called back MVV to say she had been unable to reach her aunt but had texted her, Crotts became angry. Finally, Crotts let MVV out at her home and told her to delete the evidence from the phone that Dudley had called her aunt. Accordingly, MVV went in her aunt's bedroom and deleted the text.

MVV then made a FaceTime call to Dudley and another friend named Madison Bradley and told them "how it went down in the car. And then they looked at me, and I showed them my arm, and they agreed that's rape." At trial, the Commonwealth introduced photographs depicting bruises to MVV's arm that she had taken on November 16 and then four or five days later.

MVV and Crotts exchanged text messages in the week following the encounter on November 15. MVV testified that her contact with Crotts continued because he made frequent threats, for example, to tell Dudley's father that she was in an interracial relationship. MVV

- 3 -

took a screenshot of the messages, which the Commonwealth introduced at trial. In the texts MVV repeatedly accused Crotts of having raped and assaulted her. In one text MVV said, "If only people knew u raped and abused me that night but I would never threaten u w that," to which Crotts responded, "I'll post it rn [or right now]." When MVV asked if Crotts was sorry for what he had done, he replied: "Are u sorry for what u did. If u are I am." In another text Crotts said he was "sorry" "not for doing it [but] for the pain it caused after."

On December 21, 2021, MVV contacted Powhatan County Deputy Sheriff Kaitlyn Crane (who was her former school softball coach) to report the matter. As a result of this disclosure to Crane, Powhatan Investigator Marilyn Durham spoke to MVV. MVV then called Crotts as Durham recorded the call. Durham instructed MVV what to say during the call. The Commonwealth introduced the recorded call at trial. In the call, during which MVV repeatedly insisted that Crotts explain why he had raped and abused her, he variously said: "Nothing gives me the right to do that"; "I didn't plan it"; and "I promise that I will never rape or abuse you again."

Additionally, the Commonwealth introduced 2,178 phone texts between MVV and Crotts made between December 21 and 27, 2021. In one exchange MVV said that Crotts "had no right to hurt or rape me that night[.] [S]ay [I] deserve it again [S]tephen," and Crotts replied, "Ik [or I know] I didn't." In another exchange MVV asked, "[G]ood guys rape?," and Crotts responded, "[G]ood girls fuck ramdom peolel [sic]?" When MVV queried whether that gave Crotts the right to rape her "bc [I] pushed u over?" Crotts's response was, "[N]o I was wrong." After MVV texted that "rape can't j be left in the past," Crotts replied, "[A]nd neither can what I went through."

After the circuit court denied his motion to strike, Crotts testified. Crotts stated that his relationship with MVV had been "very toxic" from the outset and that he had frequently tried to

- 4 -

placate her by saying "what she wanted to hear." Crotts testified that on November 15 they had agreed to "have sex one more time." Crotts stated that after MVV got into his van she had gotten into the backseat and taken off her clothes. The two then had sexual intercourse; at one-point Crotts asked MVV if she wanted to stop because "[i]t's not comfortable" in the back of the van, but she declined, saying that they should "enjoy it one last time." Afterwards, he said, MVV "started kicking the dash and hitting her head against the back of the seat" when Crotts told her that he would not delete her nude photos.

Then, MVV allegedly struck Crotts in the face, which led him to remove her from the van. MVV continued to hit the vehicle as Crotts started to drive away, causing her to fall to the ground. Crotts stopped the van, and MVV ran back and got in. Crotts testified that he wanted MVV to get out, but she refused to do so unless he agreed to delete her nude pictures. Finally, they agreed that Crotts would drive her home. On the way, according to Crotts, she received a phone call from Dudley and told her: "[H]elp me, help me. Stephen has me. He won't let me go."

After Crotts drove to MVV's driveway, she continued "screaming to delete the nudes." Crotts testified that he persuaded MVV to call Dudley, whom he asked to calm her down. When Crotts refused to delete the pictures, MVV supposedly hit his face and threatened to tell her aunt that he had raped her. Crotts claimed that in self-defense he then hit her in the arm three times. Only after Crotts said that he would delete the pictures did MVV get out of the van. Later that night, though, MVV contacted Crotts, who returned to her home and gave her a vape pen.

Crotts testified that on several occasions after November 15 he had sex with MVV both at his house and hers. While denying that he had raped or assaulted MVV, Crotts maintained that he had said he was "sorry" in various text messages in an attempt to save their relationship. Crotts denied that his statements about being "sorry" was an admission that he had raped MVV.

- 5 -

Wyatt Lowe testified as a character witness for Crotts. He stated that Crotts's "reputation in the community is a great one and it's very truthful."

After the parties made their closing arguments, the trial judge stated that if the case had involved only the testimony of MVV and Crotts, it would be a "he-said she-said case" that might not have warranted a conviction on the rape count. "But I think these text messages are highly incriminating and are sufficient to prove the Commonwealth's case."

ANALYSIS

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)). A bench trial accords the fact finder's judgment "the same weight as a jury verdict." *Kelley v. Commonwealth*, 69 Va. App. 617, 624 (2019).

Stating that the evidence in this case hinged almost entirely on MVV's credibility, Crotts challenges her testimony as inherently incredible. Crotts points to the 36-day delay in reporting the incident to the police as well as evidence that in the days following the claimed rape MVV

continued to have contact with Crotts and had consensual sex with him on several occasions.[3]

We find, however, that Crotts has not preserved this claim for appellate review.

In a bench trial, a defendant who presents evidence after the circuit court has denied a motion to strike the Commonwealth's case-in-chief waives any arguments made in that initial motion in any subsequent motion to strike raised at the conclusion of all the evidence because the evidence after the defendant has presented "will necessarily raise a new and distinct issue from the one presented by the denied motion to strike." *Murillo-Rodriguez v. Commonwealth*, 279 Va. 64, 83 (2010). If a defendant does not move to strike at the conclusion of all the evidence, then the only potential avenues to preserve a sufficiency argument are closing argument and a motion to set aside the verdict. *See id*. at 82-84; *Dickerson v. Commonwealth*, 58 Va. App. 351, 356-58 (2011).

Here, after the Commonwealth rested and Crotts moved to strike he put on his own evidence, thus waiving the initial motion to strike. At the conclusion of all the evidence Crotts chose only to make closing argument. And after the circuit court convicted Crotts on the two charges, the defense made no motion to set aside the verdict. Accordingly, Crotts's sufficiency claim is reviewable only if properly advanced in closing argument. We hold that his closing argument raised a discrete contention that did not preserve his argument on appeal.

---

[3] On cross-examination of MVV, defense counsel questioned her about a video in an effort to show that contrary to her testimony she had previously accused Crotts of raping her before the November 15 incident. On brief, Crotts contends that MVV's "entire testimony was impeached by" the inconsistencies brought out from her testimony and her statements in the video. Crotts, however, did not introduce the video into evidence, so it is not part of the record. *See* Rule 5A:7(a)(3) (record on appeal includes "each exhibit offered in evidence, whether admitted or not, and initialed by the trial judge"). We have no way of evaluating exactly what MVV was asked in the video or what responses she gave, and we likewise have no way to know how the remainder of the video might bear upon any assessment of her credibility. In this regard, in its closing argument the Commonwealth contended that the video showed "two people joking around saying some off-colored things."

An argument that the Commonwealth's evidence was not credible does "not raise the question of whether the Commonwealth's eyewitness testimony was inherently incredible as a matter of law." *Commonwealth v. Bass*, 292 Va. 19, 33 (2016). In *Bass*, the defendant moved to strike robbery, attempted robbery, and firearm charges primarily on the ground that there was no proof that he knew or acted in concert with the gunman. *Id.* The defendant pointed to only one "discrepancy in the witnesses' testimony. He did not contend the testimony was unworthy of belief or that the jury should not be permitted to weigh the witnesses' credibility." *Id.* Consequently, the Supreme Court of Virginia held that Bass waived his "inherently incredible" argument. *Id. See also Kelley*, 69 Va. App. at 626 ("legal determination that a witness is inherently incredible is very different from the mere identification of inconsistencies in a witness' testimony or statements").

Here, during his closing argument, Crotts did not argue that MVV's testimony was inherently incredible as a matter of law. Rather, the defense repeatedly suggested that the case boiled down to a determination of "the credibility of both witnesses" and that "we have two fact witnesses that are inconsistent." Crotts contended that after learning he had spent the night with his sister and two other women MVV "wasn't happy about that" and had "a motive to . . . fabricate" her allegations. Crotts also argued that the case was "about two kids, essentially, who are playing with each others' lives by claiming these words 'rape' and 'abduction,' and it's just not factual." He also advanced various legal arguments as to why his actions did not amount to abduction or assault and battery. Crotts concluded by querying "who do you believe" and arguing that "from a[n] evidentiary standpoint the facts don't rise to the level that's sufficient."

We conclude from this record that, as in *Bass*, Crotts "failed to make the circuit court aware of his legal position, and consequently he failed to preserve this argument for appeal." 292 Va. at 33. "An argument focused only on which witness is more worthy of belief" does not

fairly apprise the court that the prosecution's evidence should fail as a matter of law. *Dickerson*, 58 Va. App. at 358. Crotts has not invoked the ends of justice exception to Rule 5A:18, and we do not do so sua sponte. *See Spanos v. Taylor*, 76 Va. App. 810, 827-28 (2023); *Merritt v. Commonwealth*, 69 Va. App. 452, 461 (2018).

Moreover, if we were to reach the merits of Crotts's claim, the evidence plainly supported his rape conviction. MVV's testimony, if credited, proved that Crotts had raped her. MVV acknowledged that she initially had agreed to have sex with Crotts on November 15 "for closure" but that "when it came down to it when he started hugging me and kissing on me I did not. I said no." Crotts disregarded this and had both vaginal and oral sex with MVV. On brief, Crotts does not challenge the facial adequacy of MVV's testimony to prove the rape.

The record belies Crotts's contention that the case focused almost entirely on an assessment of MVV's credibility. In convicting Crotts of rape, the trial judge relied heavily on the text messages between him and MVV after the November 15 encounter, characterizing them as "highly incriminating and . . . sufficient to prove the Commonwealth's case." In these texts MVV often accused Crotts of having raped her, and he never directly denied it. To the contrary, he said he was "sorry" or that he had done nothing worse than MVV when he caught her having sex with Cam. At trial, Crotts denied that any of his texts amounted to an acknowledgment that he had raped MVV, and in closing argument he maintained that he had sent the texts in an attempt to "do anything, say anything in order to keep [their] relationship." The trier of fact was entitled to reject this explanation and instead conclude that Crotts's texts effectively amounted to a confession that he had raped MVV. *See Marable v. Commonwealth*, 27 Va. App. 505, 510-11 (1998) (sufficiency of evidence in arson case partly established by trier of fact's rejection of defendant's statement that fire had started accidentally).

MVV's testimony was not inherently incredible and, standing alone, sufficed to prove Crotts's guilt on the rape charge. We note, however, that in addition to the substantial corroboration of her account provided by Crotts's many texts, the Commonwealth presented other evidence buttressing her account. Dudley testified that MVV frantically called her seeking help. Dudley witnessed on FaceTime Crotts's physical assault of MVV. Then, after MVV finally was able to return home that night, she made a FaceTime call to Dudley and another friend, told them what happened, and showed pictures of bruises to her arm from the assault. The Commonwealth introduced photos at trial of those pictures as well as additional photos MVV took several days later. All this evidence amply supported Crotts's rape conviction.

CONCLUSION

For the foregoing reasons, the circuit court's judgment is affirmed.

*Affirmed.*