COURT OF APPEALS OF VIRGINIA

Present:   Judges AtLee, Friedman and Frucci
Argued at Norfolk, Virginia


NICHOLAS L. ORTIZ

                                                        MEMORANDUM OPINION* BY
v.          Record No. 0084-24-1                 JUDGE FRANK K. FRIEDMAN
                                                              MARCH 4, 2025
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF PORTSMOUTH
Brenda C. Spry, Judge

Patricia A. René (The René Law Firm, on briefs), for appellant.

Elizabeth Kiernan Fitzgerald, Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


Nicholas L. Ortiz was convicted by a jury of two counts of solicitation to commit murder

in violation of Code § 18.2-29 and two counts of obstruction of justice in violation of Code

§ 18.2-460(C).  The trial court sentenced Ortiz to 25 years of incarceration on each of the

solicitation convictions, suspending 13 years for each.  He received a five-year sentence of

incarceration on each of the obstruction of justice convictions, all suspended, and the trial court

ordered that the active sentences run concurrently.

On appeal, Ortiz contends that the trial court erred in denying his motions to strike all

offenses for insufficient evidence.  He also contends the trial court abused its discretion in

determining his sentence.  Finding no error, we affirm the trial court's judgment.

---

*  This opinion is not designated for publication.  See Code § 17.1-413(A).

BACKGROUND[1]

We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)).  In doing so, we "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn [from that evidence]." *Ray v. Commonwealth*, 74 Va. App. 291, 307 (2022) (alteration in original) (quoting *Bagley v. Commonwealth*, 73 Va. App. 1, 26 (2021)).

Nicholas Ortiz was incarcerated at the Portsmouth City Jail in the fall of 2022.  He was housed with Shawn Gee, Paul Wright, and Alex Tew.  During a card game, Wright overheard Ortiz tell Tew that Ortiz wanted to murder his ex-girlfriends so he "could get out of jail."  Wright later asked Ortiz if he was "trying to get the ladies killed or what?" and Ortiz said "yeah."  Wright told Ortiz not to talk to anyone else about it because he knew someone who might be able to help.  A few days later, Wright told Ortiz that he "had an uncle that would probably do the deed for [Ortiz]" but that "it would cost him."  Wright informed Ortiz he was unsure how much it would cost because he "wasn't the one that was going to do the contract" and that "it might cost him a thousand or two thousand in the end."  Wright explained, though, that Ortiz "to get started" would need "to put down some kind of payment to let them know you're serious."

Wright told Ortiz that he needed to provide him with "all the details" about the women he wanted killed.  Ortiz created a map containing information about the two prospective victims,

---

[1] Parts of the record in this case were sealed.  "[T]his appeal requires unsealing certain portions to resolve the issues raised by the parties." *Mintbrook Devs., LLC v. Groundscapes, LLC,* 76 Va. App. 279, 283 n.1 (2022).  We unseal only the facts mentioned in this opinion; the rest of the record remains sealed.

who were his ex-girlfriends, N.C. and M.W.[2] Ortiz provided where the victims lived and worked, including descriptions of their vehicles, license plate numbers, and where N.C. picked up her son from elementary school.[3] Ortiz described each woman's physical appearance and distinguishing features, adding that only M.W. had a firearm in the house. Ortiz gave the map with the descriptions of the victims to Wright, so that he could pass it along to the person that was going to carry out the murders.

Ortiz explained to Wright that one of the women had charges against him in Portsmouth and that he "had something going on in Suffolk with one of the other girls." Ortiz stated that he "could beat the charges, if there's no victim, there's no crime."

Through family members, Wright contacted law enforcement and met with detectives. Wright turned over the map and agreed to facilitate a telephone call between Ortiz and Detective M. Siniscalchi, posing as Wright's uncle, about the murders. On October 18, 2022, Wright called his "uncle's" phone number, spoke briefly to Detective Siniscalchi to establish the ruse, then handed the phone to Ortiz. Wright stayed and listened to the conversation. The recorded call was played at trial.

On the call, Detective Siniscalchi asked Ortiz if he knew his nephew and asked Ortiz to "do [Siniscalchi] a favor and look out for [Wright]." Ortiz said, "Absolutely." Detective Siniscalchi asked which of the victims should be "dealt with" first, to which Ortiz replied that N.C. was the "most important" and that it needed to be done by October 25, since Ortiz had a court date involving N.C. then. The detective explained that what Ortiz wanted done "usually involves quite a bit of money" and asked how Ortiz could pay for it. Ortiz agreed to give Wright between $200 and $250 as a down payment. The detective responded that "If you do that tonight

---

[2] We use initials to protect the privacy of the victims.

[3] Ortiz is the father of N.C.'s son.

and he gets word to me that his money is there, I'm going to go ahead and I'm going to make a move on this girl, [N.C.], okay?" Ortiz responded, "Yeah. I'm good with that." The detective then confirmed with Ortiz the vehicle that N.C. drove and that she would not be armed. When asked by the detective if N.C. had children, Ortiz confirmed she had a son. And after a long pause, Ortiz stated he did not want the child harmed.

Switching to M.W., Ortiz told the detective that she had a "sleeve" tattoo on her left arm, owned a gun, and had no children. Ortiz stated he did not care if the detective stole M.W.'s gun "to make money" and offset the total cost of the hits. Ortiz informed the detective that he had until February to deal with M.W. since the court date involving her was not until then.

After the call, Wright received $200 on his canteen account from Ortiz which Wright characterized as a "down payment." The rest of the fee was to be paid "[a]fter the hits were carried out." In a subsequent conversation with Detective Siniscalchi, Ortiz denied any knowledge or involvement in making the threats but acknowledged that he only recalled "bits and pieces" of the conversation.

At trial, N.C. and M.W. testified and verified that their personal information provided by Ortiz to Detective Siniscalchi was accurate. Each confirmed that in October of 2022 Ortiz was awaiting trial on criminal charges—abduction, robbery, and domestic assault—where they were the complaining witnesses. On cross-examination, N.C. and M.W. testified that Ortiz was not found guilty of the felony charges against him in the other two criminal matters.

Wright testified at trial, and the jury heard that he had more than 30 felony convictions, plus pending charges at the time of the telephone call. Wright testified that Ortiz "offered to pay me. He offered to pay me to have his people killed. That's what he did, and I turned it over and did my part." Wright also denied threatening or pressuring Ortiz to make statements, and he also

- 4 -

denied beating up Ortiz, noting that he was "a little guy" and Ortiz was "an ex-marine" that "work[ed] out every day."

At the conclusion of the Commonwealth's case, Ortiz moved to strike the charges against him, arguing that there was no proof that he "hired" or "solicited" anyone. Ortiz also argued he lacked the intent to obstruct justice. The trial court denied the motion, and Ortiz proceeded to present his own evidence.

Sara Janes, Ortiz's former co-worker and current girlfriend, testified that she received a letter from Ortiz from jail dated October 14, 2022. Janes could not recall when exactly she received the letter, but that it came in one of three envelopes, all of which were post-marked November 3, 2022. The handwritten letter stated that Wright was pressuring Ortiz to connect with his "ex-cop private investigator uncle" to take care of N.C. and M.W. He further stated that Wright threatened to send "some GD or Gangster Disciples" after him in jail and after his family and friends. Ortiz wrote that he "had been trying not to get into a confrontation so [he] [wouldn't] get jumped, stabbed, or killed in here." Ortiz provided, and the trial court admitted, a photograph of three jail envelopes addressed to Janes and postmarked November 3, 2022. Janes had "received phone calls [from Ortiz] that there were things going on, and [she] asked him to send a letter home for records."

Gee, an inmate housed with both Wright and Ortiz, testified that Wright went through Ortiz's mail, discussed the contents with himself and Tew, and "taunted" and "harass[ed]" Ortiz. Gee saw Ortiz draw the map and overheard the call between Ortiz and Detective Siniscalchi, saying that Wright was "shoulder to shoulder" with Ortiz at the time. Gee testified that Wright took Ortiz's canteen, and when that happened, Ortiz appeared "in shock [and] fear." Gee also testified that after being subpoenaed to testify on Ortiz's behalf, he was transferred to another jail, where he was stabbed in the face by an inmate in the Gangster Disciples gang.

Ortiz testified and denied soliciting anyone to murder his ex-girlfriends. Ortiz testified that Wright was his cellmate, and, over the course of two weeks, Wright assaulted him and stole his commissary. Ortiz stated that he reported the behavior to the jail, but that no action was taken. Concerning the October phone call, Ortiz claimed that Wright "told me I had to answer questions when he made the phone call to his private investigator, uncle/ex-cop, and I had to answer the questions or he was going to stab me." Ortiz explained that he was also threatened by Tew and another inmate known as Breezy, who was a "Gangster Disciple." Ortiz testified that he wrote the map—providing details about the victims—at Wright's request and that Wright was right next to him during the phone call with the detective. Ortiz also testified that Wright "told [him] to answer the questions or [Wright] and Tew and the other inmate were going to beat me up or stab me, or both, or kill me." Ortiz denied offering to pay anyone to do anything, and he said he wrote the letter to Janes on October 14th.

On cross-examination, Ortiz conceded that he never told Janes to inform N.C. or M.W. that their lives may be in danger or to contact the police. Ortiz was asked why he paused on the call when he was asked what to do with his and N.C.'s young child; Ortiz explained that the pause was because he was being held down and "punched in the face a few times." When Ortiz met with detectives during an initial interview, he never stated that he was threatened, beaten, or forced into the phone call; instead, he told detectives that people had been going through his mail. Ortiz admitted that he had not told the detectives the same story he testified to but denied lying to anybody.

Detective Siniscalchi was recalled as a rebuttal witness and confirmed that during his interview with Ortiz, he recalled "narcotics being mentioned about something."[4] He said Ortiz

_____

[4]At the prospect of the Commonwealth playing the interview, defense counsel said that the Commonwealth "could lead [the witness]. [He would] waive the leading."

"spoke freely" about someone smoking crack in the cell and about inmates taking paperwork that belonged to others. Detective Siniscalchi said that Ortiz never mentioned being threatened by anyone directly throughout the 30-minute interview held "outside of the jail" at the detective's office.

Upon Ortiz presenting his evidence, his attorney made a renewed motion to strike the charges, arguing the evidence was insufficient as a matter of law. Counsel argued that the indictments alleged that Ortiz solicited murder "for hire" and that the Commonwealth failed to prove that "one particular element" in the two solicitation indictments: the "indictment cannot stand in count 1 or count 2 because they're missing one particular element in the indictment and that piece being a killing for hire, and we're asking that those two counts be struck." As to the obstruction charges, Ortiz's counsel moved to strike those as well, arguing that "the witness is simply not credible." The trial court denied Ortiz's renewed motion to strike all the charges.

After instructing the jury and closing arguments, the jury convicted Ortiz of all charges. Ortiz's counsel made a motion to set aside the verdict as contrary to law and the evidence on all counts. The trial court denied the motion.

At sentencing, the trial court heard victim impact testimony from M.W. and N.C., who both testified that they were in constant fear, were experiencing trauma triggers, were not sleeping, and required therapy to manage the aftermath of Ortiz's actions. N.C. said that Ortiz was not a good father, put the child in harmful situations, and paid $68 per month in child support. Officer Gary Waterman of the Portsmouth Probation and Parole office testified that Ortiz indicated on his pre-sentence report questionnaire that he paid $780 per month in child support.

Ortiz introduced multiple letters that indicated he was a good man and father. Angela Capolino, a former girlfriend, testified that she did not witness any violence from Ortiz, and

- 7 -

although she never met the child, said Ortiz "loved his son more than anything else in the world." Daniel Androvett testified that he had known Ortiz for 27 years and that Ortiz was "a good guy." Donna Androvett, Ortiz's aunt, asked the trial court for leniency in sentencing. She said he was a "very gentle, kind, caring man," "[n]ever had any issues in the past," and was "starting new."

The Commonwealth asked the trial court to sentence Ortiz to the maximum amount of time for each charge and suspend all but 25 years of incarceration. The defense asked for a completely suspended sentence, saying that there was nothing in Ortiz's "background to suggest that . . . that length of sentence would be warranted."

The trial court stated that it read the letters in support of Ortiz and the Commonwealth and opined that "the evidence was overwhelming." The trial court observed, "There was a detailed map drawn." It also commented on the phone conversation and the meeting between Ortiz and the detectives outside of the jail where they gave Ortiz "an opportunity to recant or withdraw" the plan. The trial court noted that at no time did Ortiz recant, withdraw, or change any of his statements, and thus, the trial court concluded that the "the jury verdict was well supported." The trial court found, though, that Ortiz had lived a "pretty exemplary life" and took that into consideration. The trial court ultimately sentenced Ortiz to 25 years of incarceration on each of the solicitation offenses, suspending 13 years on each, and ordered that the sentences run concurrently. It imposed five-year sentences of incarceration, all suspended, on each of the obstruction convictions. Thus, Ortiz received an active sentence of 12 years of incarceration.

ANALYSIS

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting

*Smith v. Commonwealth*, 296 Va. 450, 460 (2018)).  "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'"  *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)).  "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)).  "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'"  *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

> I. The trial court did not err in denying Ortiz's motions to strike the evidence of solicitation to commit murder for hire of N.C. and M.W.  (Assignments of Error I and II).

"Any person who commands, entreats, or otherwise attempts to persuade another person to commit a murder is guilty of a felony punishable by confinement . . . for a term not less than five years and not more than forty years."[5]  Code § 18.2-29.  Criminal solicitation involves the "attempt of the accused to incite another to commit a criminal offense.  It is immaterial whether the solicitation has any effect and whether the crime solicited is in fact committed . . . [t]he gist of [the]

---

[5] The indictment provided that Ortiz solicited to commit murder "for hire."  In the trial court and now on appeal, Ortiz argues that, while typically the Commonwealth is not required to prove the "for hire" element under Code § 18.2-29, here the Commonwealth was required to establish that element because it opted to use that language in the indictment; essentially, the Commonwealth included an additional element that was not in fact required pursuant to Code § 18.2-29.  In the trial court at the motion to strike stage, Ortiz's counsel noted this: "If you notice, the criminal solicitation statute does not have anything in it relating to hiring; all right, and so the Commonwealth elected . . . .  They elected to do a murder for hire indictment."  Ortiz's counsel went on to argue that, under Code § 18.2-29, the Commonwealth failed to prove that the solicitation to murder was "for hire."  As discussed below, the record fails to support Ortiz's suggestion that there was insufficient evidence as a matter of law that the plot was "for hire."

The sentencing order incorrectly reflects that appellant was convicted under Code § 18.2-31.  As appellant was convicted of solicitation to commit murder in violation of Code § 18.2-29, this matter is remanded to the trial court solely to correct that clerical error.

offense is incitement." *Branche v. Commonwealth*, 25 Va. App. 480, 490 (1997) (quoting *Huffman v. Commonwealth*, 222 Va. 823, 827 (1981)).

In *Pedersen v. Richmond*, 219 Va. 1061 (1979), the Supreme Court of Virginia explained that "[s]olicitation may comprise a course of conduct, intended to induce another to act, that continues over an extended period. All the evidence bearing on [the accused's] intent is relevant to a determination of his guilt or innocence." *Id.* at 1067. Further, the "separate crime of solicitation may be completed before an attempt is made to commit the solicited crime." *Id.* at 1067-68; *see also Brooker v. Commonwealth*, 41 Va. App. 609, 614 (2003). In determining intent, the fact finder may consider the conduct of the person involved and all the circumstances revealed by the evidence. *See Secret*, 296 Va. at 228-29.

We examine Ortiz's entire course of conduct and the totality of the circumstances in determining whether he incited Detective Siniscalchi to commit murder for hire. Ortiz was incarcerated pending separate trials in which two of his former girlfriends were the victims and complaining witnesses. During a card game with cellmates, he spoke openly about wanting both women dead, stating he could beat the charges if there were no victims. This was no unspecified act—Ortiz drew a map which identified where each woman worked, described their cars (including license plate numbers), where one lived and a last known address for the other, telephone numbers, and where one picked up their child-in-common after school. Ortiz gave Wright the map after hearing that Wright might know someone to do the job. Wright then contacted Detective Jackson of the Portsmouth City Police Department because he "didn't want to see two girls get hurt." Detective Siniscalchi, posing as Wright's uncle and private investigator, gave Wright his telephone number and arranged for Ortiz to call to discuss the murders.

Ortiz participated in the telephone call and confirmed the information that Detective Siniscalchi had about the women was accurate. Ortiz informed the detective that N.C. needed to be

dealt with by October 25 and that M.W. needed to be dealt with by the upcoming February. The only hesitation expressed by Ortiz during the phone call was when Detective Siniscalchi asked whether to hurt his son; Ortiz, after a long pause, told the detective not to hurt the son.

During the phone call, Ortiz said he trusted the "uncle" to decide how and when to carry out each attack and agreed that he would "absolutely" look out for Wright in the jail. Ortiz told Detective Siniscalchi he could steal items from the houses to make money toward the final fee, including M.W.'s Glock. The first murder they discussed, of N.C., had to be done within the week, and Ortiz agreed to put $200 in Wright's canteen account that night as a down payment toward a final fee to be determined. Ortiz in fact provided Wright with money as a down payment. These facts are sufficient to establish that the solicitation to murder was "for hire," and we cannot say the factfinder here was plainly wrong or without evidence in so finding. *See Secret*, 296 Va. at 228.

Furthermore, Ortiz presented a completely different account of the incident during trial compared to his private interview with Detectives Siniscalchi and Jackson. The jury was entitled to consider Ortiz's changing accounts of what happened and assess his credibility accordingly. Also, the testimony in this case involved numerous witnesses that had questionable credibility, and, here, it was for the factfinder to assess the credibility of Ortiz, Wright, and Gee and to determine the weight to give to their respective stories. *See Ragland v. Commonwealth*, 67 Va. App. 519, 529-30 (2017) ("The sole responsibility to determine the credibility of witnesses, the weight to be given their testimony, and the inferences to be drawn from proven facts lies with the fact finder.").

We conclude that a reasonable finder of fact could conclude that the Commonwealth's evidence proved that Ortiz incited and hired Detective Siniscalchi to plan and carry out the murders of N.C. and M.W. in exchange for Ortiz protecting Wright and putting money in Wright's account in jail.

II. The trial court did not err in denying Ortiz's motions to strike the evidence of obstruction of justice regarding N.C. and M.W. (Assignments of Error III and IV).

Code § 18.2-460(C) states if "any person by threats of bodily harm . . . knowingly attempts to intimidate or impede a . . . witness . . . relating to the violation of . . . any violent felony offense listed in subsection C of § 17.1-805, he is guilty of a Class 5 felony." Solicitation to commit murder is one of the enumerated felony offenses in Code § 17.1-805(C). "The statute was enacted for the purpose of deterring those who intimidate *any* witness lawfully engaged in his duties." *Fleming v. Commonwealth*, 13 Va. App. 349, 356 (1991).

In the trial court, Ortiz argued there was insufficient evidence as a matter of law on the obstruction of justice charges because the witnesses were not credible. On appeal, Ortiz argues that the obstruction of justice convictions should be reversed because there is insufficient evidence to support the murder for hire convictions, thus assignments of error three and four hinge on this Court accepting Ortiz's first two assignments of error. We are not persuaded by Ortiz's arguments.

To start, as explained in Part I of the analysis, we find that the evidence is sufficient as to the solicitation convictions. Here, Ortiz solicited Detective Siniscalchi to murder N.C. and M.W. During a card game with his cellmates, he said he wanted his ex-girlfriends dead so that their pending cases against him in two separate jurisdictions would be dismissed. As Wright noted, Ortiz stated that he could beat the charges and get out of jail if there were no victims. Ortiz drew a detailed map of where each woman could be found, and included telephone numbers, work schedules, and where N.C. picked up her son from afterschool care.

We conclude that the trial court did not err in denying the motion to strike because the evidence was sufficient that Ortiz knowingly attempted to impede the witness testimony of M.W. and N.C. by soliciting Detective Siniscalchi to murder them so that neither could testify against him in separate, upcoming criminal proceedings.

III. The trial court did not abuse its discretion in its imposition of a 12-year active sentence under the facts and circumstances of the case. (Assignment of Error V).

Recognizing that "[c]riminal sentencing decisions are among the most difficult judgment calls trial judges face," the trial court "'clearly' acts within the scope of its sentencing authority 'when it chooses a point within the permitted statutory range' at which to fix punishment." *Minh Duy Du v. Commonwealth*, 292 Va. 555, 563-64 (2016) (quoting *Alston v. Commonwealth*, 274 Va. 759, 771 (2007)). "Because this task is so difficult, it must rest heavily on judges closest to the facts of the case—those hearing and seeing the witnesses, taking into account their verbal and nonverbal communication, and placing all of it in the context of the entire case." *Id.* at 563.

Solicitation of murder for hire is not included in the Virginia Sentencing Guidelines offenses, so the trial court did not receive guidelines with the pre-sentence report. The statutory penalty for solicitation to commit murder is "for a term not less than five years or more than forty years." Code § 18.2-29. Obstruction of justice under subsection C is a Class 5 felony, punishable by a "term of imprisonment of not less than one year nor more than 10 years." Code §§ 18.2-460(C), -10(e).

Here, the trial court sentenced Ortiz to 25 years of imprisonment for each solicitation conviction, well within the statutory limit of "not more than forty years." Further, the trial court suspended 13 years of each sentence and then elected to run them concurrently. It imposed a five-year sentence for each obstruction of justice conviction, also below the statutory limit of ten years each, and suspended the time in its entirety. Code §§ 18.2-10(e), -460(C). Thus, Ortiz received an active sentence of 12 years. We cannot say that the trial court's sentence constituted an abuse of discretion, where the active sentence was well below the maximum permitted and the trial court expressly accepted some of Ortiz's mitigation evidence in deciding to suspend significant portions of the sentence. *See Minh Duy Du*, 292 Va. at 564; *Thomason v. Commonwealth*, 69 Va. App. 89, 99 (2018).

## CONCLUSION

For the foregoing reasons, the trial court's judgment is affirmed.  We remand solely for correction of the clerical error in the final sentencing order.

*Affirmed and remanded.*